#29688-a-MES
**2022 S.D. 55**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

KEVIN DAVIES,             Plaintiff and Appellant,

     v.

GPHC, LLC,                Defendant, Third-Party
                                   Plaintiff, and Appellee,

     v.

MICHELLE L. WILSON and
JAY M. BLACK,            Third-Party Defendants.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
BROWN COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE RICHARD A. SOMMERS
Judge

* * * *

DAVID J. KING
KIRK D. RALLIS of
King Law Firm, P.C.
Sioux Falls, South Dakota            Attorneys for plaintiff and
                                   appellant.


PAUL H. LINDE of
Schaffer Law Office, Prof. LLC
Sioux Falls, South Dakota            Attorneys for defendant, third-
                                   party plaintiff, and appellee.

* * * *

CONSIDERED ON BRIEFS
JANUARY 10, 2022
OPINION FILED **09/14/22**

#29688

SALTER, Justice

[¶1.]        As he attempted to enter his apartment, Kevin Davies was bitten by a dog owned by another tenant.  Davies commenced this action against his landlord, GPHC, LLC (GPHC), alleging general negligence and negligence per se.  The circuit court granted GPHC's summary judgment motion, concluding that GPHC lacked actual knowledge of the dog's alleged dangerous propensities under a general negligence theory and that GPHC was not the owner or keeper of the dog under the relevant statute to support Davies's negligence per se claim.  Davies appeals.  We affirm.

**Facts and Procedural History**

[¶2.]        Kevin Davies and Jay Black each leased separate apartments in a six-unit apartment building in Aberdeen.  Davies's unit was located in the basement of the apartment building.  Black and his girlfriend, Michelle Wilson, lived in an apartment located above Davies.

[¶3.]        GPHC is a South Dakota limited liability company, which owns and manages the apartment building where Davies and Black resided.  Both Davies and Black signed one-year lease agreements with GPHC, which contained identical provisions prohibiting pets on the leased premises absent the express permission of GPHC.  The sole member of GPHC, Mark Rich, stated that he commonly allowed residents to keep dogs in their apartments upon request.

[¶4.]        Black owned a female Rottweiler named Tequila.  Before moving into the apartment, he informed Rich about the dog and asked to keep Tequila at the apartment.  Rich consented, and, according to Rich, Black negotiated with him to

house Tequila in an unattached garage near the rear of the rental property due to Black's concerns about Tequila's frequent barking.

[¶5.] Davies owned an American bulldog named Flek, which lived with Davies inside his apartment—also with Rich's consent. According to Davies, Tequila once "went after" Flek when the two dogs crossed paths, though he did not clarify whether the encounter actually resulted in a physical altercation between the dogs. Beyond this incident, however, Davies stated that he had no negative interactions with Tequila and had never complained to GPHC about Tequila's behavior.

[¶6.] After returning home from work on July 25, 2018, Davies parked near the rear of the apartment building and walked toward the door of his basement apartment. As Davies approached the door, he noticed Wilson standing in the backyard near the parking lot, attending to Tequila, who was tethered to a nearby tree. Davies stopped and spoke briefly with Wilson before continuing toward the building. When he reached the sidewalk abutting the building, he noticed Tequila approaching him from the yard. Davies attempted to edge closer to the building to avoid Tequila, but when he realized Tequila's leash would not prevent her from reaching the sidewalk, he held out his right hand to prevent Tequila from jumping on him. Without provocation, Tequila bit Davies's outstretched hand.

[¶7.] The bite produced significant lacerations to Davies's hand. He drove himself to a local emergency facility where medical personnel determined Davies would require corrective surgery, which was performed that evening. After being notified of the injury by hospital staff, officers from the Aberdeen Police Department

arrived at the emergency room and spoke with Davies, who told them that his neighbors owned the dog that had bitten him.

[¶8.] The officers went to the apartment building to interview Black, who was not home at the time. Wilson was present, however, and she admitted that Tequila had inflicted the injuries to Davies's hand. Wilson also reported that it was her common practice to keep Tequila tied up in the backyard of the building when the dog was not otherwise kenneled in the garage or inside their apartment. She reported that the building's residents regularly walked through the yard without incident while Tequila was present. Wilson also claimed that Tequila had not previously bitten anyone.

[¶9.] Black called one of the investigating officers later that evening to discuss what had happened. He told the officer that he was unsure why Davies was near Tequila while Black was not present and claimed he had advised Davies not to come near the dog in the past. However, when the officer explained that Tequila's leash allowed her to reach the sidewalk where Davies was walking, Black told the officer that he understood and stated that he accepted responsibility for the dog's actions.

[¶10.] For his part, Rich claimed he had no knowledge of Tequila's temperament prior to the attack on Davies. Though he was aware that Tequila was a Rottweiler and of Black's concerns about Tequila's inclination to bark, Rich explained that he had never met the dog and had never received any complaints from Davies or other residents about Tequila's behavior. In fact, Rich lives in Phoenix, Arizona, and it is unclear whether he had visited the apartment building

during the time Black kept Tequila in the garage. Rich testified in his deposition that GPHC did not employ a property manager to look after the apartment building in his absence. GPHC did, however, hire a local "handyman" to perform snow removal and lawn care at the building, which appears to have been done on an as-needed basis.

[¶11.] In October 2019, Davies commenced this civil action naming GPHC as a defendant. The complaint alleged that, as a landlord, GPHC was negligent for failing "to exercise ordinary care in the control, management, warning, and care of [its] property." The complaint further alleged that GPHC was negligent per se based on a statute that makes owning or keeping a "vicious dog" a public nuisance. *See* SDCL 40-34-13.

[¶12.] In its answer, GPHC denied all liability and asserted third-party claims against Black and Wilson seeking indemnity and contribution in the event it was found liable to Davies. Black was served with the third-party complaint, but he has not filed an answer. Wilson could not be located for service.

[¶13.] In January 2021, GPHC moved for summary judgment and a hearing on the motion was set for March 12. On March 3, Davies's counsel submitted an affidavit pursuant to SDCL 15-6-56(f) (Rule 56(f)), indicating his desire to depose Black and Wilson prior to the circuit court's ruling on the summary judgment motion.

[¶14.] Regarding the Rule 56(f) affidavit, the circuit court observed at a subsequent hearing that Davies's claim had been pending for over a year and determined it was "not going to delay to take depositions at this stage . . . ."

[¶15.]     The court ultimately granted GPHC's motion for summary judgment in a written decision. The court noted a lack of binding precedent concerning a landlord's liability for injuries inflicted by a tenant's dog and concluded that "the majority standard across myriad jurisdictions holds that a landlord is not liable for [such injuries] absent *actual knowledge* of the animal's dangerous propensities."[1] The court determined that the undisputed material facts established GPHC had no actual knowledge of Tequila's dangerous propensities, and, therefore, it could not be subject to liability for Davies's injuries under a general negligence theory. As for Davies's negligence per se claim, the court concluded that, "[a]s a matter of law[,]" GPHC could not be liable under the statute because it was not Tequila's owner or keeper. *See* SDCL 40-34-13 ("Any person owning or keeping a vicious dog . . . has committed a public nuisance . . . .").

[¶16.]     Davies appeals raising three issues for our review, which we have restated as follows:

> 1. Whether the circuit court erred when it granted summary judgment on Davies's general negligence claim.
>
> 2. Whether the circuit court erred when it granted summary judgment on Davies's negligence per se claim.
>
> 3. Whether the circuit court abused its discretion when it denied Davies's Rule 56(f) motion.

---

1. The circuit court decided GPHC's motion for summary judgment prior to our recent decision in *Burgi v. East Winds Court, Inc.*, which, though not directly controlling, outlined many of the governing legal principles relating to this sort of landlord liability case. *See* 2022 S.D. 6, ¶¶ 17–36, 969 N.W.2d 919, 923–28.

**Standard of Review**

[¶17.]     "We review a [circuit court's] grant or denial of summary judgment de novo." *Sheard v. Hattum*, 2021 S.D. 55, ¶ 22, 965 N.W.2d 134, 141 (quoting *Hamen v. Hamlin Cnty.*, 2021 S.D. 7, ¶ 15, 955 N.W.2d 336, 343). "In reviewing a grant or a denial of summary judgment under SDCL 15-6-56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law." *Ridley v. Sioux Empire Pit Bull Rescue, Inc.*, 2019 S.D. 48, ¶ 11, 932 N.W.2d 576, 580. "We view the evidence most favorably to the nonmoving party and resolve reasonable doubts against the moving party." *Burgi*, 2022 S.D. 6, ¶ 15, 969 N.W.2d at 923. We will affirm the circuit court's summary judgment decision "[i]f there exists any basis which supports the ruling of the trial court." *Zochert v. Protective Life Ins. Co.*, 2018 S.D. 84, ¶ 19, 921 N.W.2d 479, 486 (quoting *Brandt v. Cnty. of Pennington*, 2013 S.D. 22, ¶ 7, 827 N.W.2d 871, 874).

**Analysis and Decision**

*A Landlord's Duty to Prevent Harm to Tenants*

[¶18.]     "Negligence is the breach of a duty owed to another, the proximate cause of which results in an injury." *Ridley*, 2019 S.D. 48, ¶ 13, 932 N.W.2d at 58 (quoting *Lindblom v. Sun Aviation, Inc.*, 2015 S.D. 20, ¶ 19, 862 N.W.2d 549, 555). Therefore, before a defendant may be subject to liability for negligence, there must exist "a duty owed by the defendant to the plaintiff, which requires the defendant to conform to a certain standard of conduct in order to protect the plaintiff against unreasonable risks . . . ." *Zerfas v. AMCO Ins. Co.*, 2015 S.D. 99, ¶ 10, 873 N.W.2d

65, 69 (quoting *Erickson v. Lavielle*, 368 N.W.2d 624, 626 (S.D. 1985)). "[T]he existence of a legal duty as a necessary element of a plaintiff's negligence claim . . . is . . . a question of law that is reviewed de novo." *Burgi*, 2022 S.D. 6, ¶ 16, 969 N.W.2d at 923.

[¶19.] As it relates to *owners* of domestic animals, we have previously held that they "may . . . be held liable for harm caused by their pet if the owner knows or has reason to know that the animal has abnormally dangerous propensities." *Gehrts v. Batteen*, 2001 S.D. 10, ¶ 7, 620 N.W.2d 775, 777 (citing *Bauman v. Auch*, 539 N.W.2d 320, 324 (S.D. 1995)). We have extended this theory of liability to someone other than the dog's owner in only one instance. *See Rowland v. Log Cabin, Inc.*, 2003 S.D. 20, ¶ 11, 658 N.W.2d 76, 79. In *Rowland*, we held that the owner of a bar could be subject to liability for a dog bite occurring on the premises based upon the existence of a common-law duty owed by the bar owner to its invitees. *Id.* In doing so, we stated that "[a]lthough the duty owed by a business owner to a business invitee and the duty owed by a dog owner to individuals in society have different origins, the reasonable person standard applies to both." *Id.*

[¶20.] In an effort to invoke the rule expressed in *Rowland*, Davies first claims that he was an invitee on GPHC's property. Davies classifies himself as a "business visitor" of GPHC's and argues that GPHC owed him a duty of reasonable care on that basis. However, Davies's characterization of his legal status is incorrect.

[¶21.] A business visitor is "a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the

possessor of land." *Small v. McKennan Hosp.*, 437 N.W.2d 194, 199 (S.D. 1989) (quoting Restatement (Second) of Torts, § 332 (1965)). A tenant, on the other hand, is one who contractually acquires from a lessor of property the "temporary possession and use of real property . . . and . . . agrees to return such property to the lessor at a future time." *See* SDCL 43-32-1 (defining leasing); *see also* Restatement (Second) of Property, § 1.2 ("A landlord-tenant relationship exists only if the landlord transfers the right to possession of the leased property."); *Tenant, Black's Law Dictionary* (11th ed. 2019) ("Someone who pays rent for the temporary use and occupation of another's land under a lease or similar arrangement.").

[¶22.]      As evidenced by his lease agreement with GPHC, Davies was a tenant, not an invitee. Davies paid rent to GPHC in exchange for the temporary use and possession of GPHC's apartment. He was not, as he asserts, present on the premises for some indefinite purpose connected with the business dealings of GPHC. He was there solely for the purpose of entering the apartment that he rented from GPHC under the terms of his lease agreement. *See Krance v. Faeh*, 338 N.W.2d 55, 58 (Neb. 1983) ("The categories of tenant and invitee are by definition mutually exclusive." (citation omitted)). Therefore, GPHC did not owe Davies a duty of reasonable care based on their relationship as landlord and tenant. *See Burgi*, 2022 S.D. 6, ¶ 36, 969 N.W.2d at 927 (citing *Walther v. KPKA Meadowlands Ltd. P'ship*, 1998 S.D. 78, ¶ 44, 581 N.W.2d 527, 536) ("[T]he relationship between a landlord and a tenant does not qualify as a special relationship that would provide a predicate basis for a common law duty for landlords[.]"). But this does not end our

duty inquiry because Davies also argues that GPHC owed him a duty of reasonable care based upon the fact that the attack occurred in a common area.

[¶23.]    Generally, "the owner of a building who has leased that building to another, without any agreement to repair, is not liable to a tenant or to [the tenant's] invitees for injuries sustained by reason of its unsafe condition." *Hendrix v. Schulte*, 2007 S.D. 73, ¶ 9, 736 N.W.2d 845, 848 (citing *Boe v. Healy*, 84 S.D. 155, 159, 168 N.W.2d 710, 712 (1969)).  Analyzing the question as a legal one, we have similarly stated that "a landlord, having parted with full possession of the premises to the tenant is not liable for injury to third persons caused by the tenant's negligence." *Clauson v. Kempffer*, 477 N.W.2d 257, 259 (emphasis added) (citation omitted); *see also Burgi*, 2022 S.D. 6, ¶ 17, 969 N.W.2d at 923; Restatement (Second) of Torts § 355 (1965).

[¶24.]    However, these general rules are subject to certain exceptions that impose a duty and subject a landlord to liability in the following situations:

> (1)    where a lessor contracts to repair the premises, Restatement (Second) of Torts § 357;
>
> (2)    where an undisclosed, dangerous condition exists at the time the lease is entered into which the lessor knew or should have known about; [*Id.* § 358];
>
> (3)    where the lessor retains in his control a common area of the premises which the lessee is entitled to use as appurtenant to the leased portion, [*Id.* § 360] . . . or is necessary for the safe use of lessee's portion, [*Id.* § 361]; or
>
> (4)    where the lessor, in fact, makes repairs on the land while it is in the lessee's possession and the lessor completes the repairs negligently, [*Id.* § 362].

*Clauson*, 477 N.W.2d at 259 (internal case citations omitted).

[¶25.]     Aptly characterized as the common area exception, the third rule set out above subjects a landlord to liability "for physical harm caused by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care could have discovered the condition and the unreasonable risk involved therein and could have made the condition safe." *Englund v. Vital*, 2013 S.D. 71, ¶ 15, 838 N.W.2d 621, 628 (quoting Restatement (Second) of Torts, § 360 (1965)).

[¶26.]     Here, it is undisputed that the dog bite occurred in a common area of the leased premises. Tequila was tethered to a tree in the apartment building's common backyard, and Davies was standing on a common area sidewalk located on the property. And despite the fact Rich lives elsewhere, GPHC retained control over the building's yard and sidewalks, as evidenced by the fact it engaged an independent contractor to perform snow removal and lawn care. Therefore, GPHC owed Davies a duty to maintain the common areas of the apartment building by remedying any dangerous conditions of which GPHC was aware or any dangerous conditions GPHC could have discovered through the exercise of reasonable care— including the presence of dangerous dogs.[2]

---

2.     GPHC argues a landlord must have "actual knowledge" of the dog's dangerousness before it can be said to have breached a duty by failing to remove the dog from the premises and cites several opinions from other jurisdictions in support of that proposition. The circuit court agreed and granted GPHC's motion on that basis. However, we are unable to identify a principled basis for a rule that makes recovery in this class of cases more onerous than other types of landlord liability claims involving common areas, which typically require only that the landlord *could have discovered* the existence of a dangerous condition through "the exercise of reasonable care[.]" *See Englund*, 2013 S.D. 71, ¶ 15, 838 N.W.2d at 628.

**_Breach of a Duty_**

[¶27.]     Having established that GPHC owed Davies a duty of reasonable care to maintain the common areas of its apartment building in a safe condition, the question becomes whether GPHC breached that duty.  In other words, our inquiry is trained upon whether GPHC in the exercise of reasonable care "could have discovered the condition and the unreasonable risk involved therein and could have made the condition safe."  _Englund_, 2013 S.D. 71, ¶ 15, 838 N.W.2d at 628 (citation omitted).

[¶28.]     We have consistently held that "whether a defendant's conduct constitutes a breach of a duty is a question of fact."  _Ridley_, 2019 S.D. 48, ¶ 13, 932 N.W.2d at 580.  But that is not to say that all factual questions are _disputed_.

[¶29.]     Indeed, even factual determinations may be appropriate for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that _there is no genuine issue as to any material fact_ and that the moving party is entitled to judgment as a matter of law."  _Stern Oil Co. v. Brown_, 2012 S.D. 56, ¶ 8, 817 N.W.2d 395, 398 (emphasis added) (quoting SDCL 15-6-56(c)).  To successfully resist summary judgment, the non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy."  _Id._ (citation omitted).

[¶30.]     Here, we conclude that the relevant undisputed facts that bear upon a determination of breach permit summary judgment.  As GPHC's sole member, Rich had never seen Tequila, but Black informed him that Tequila was a Rottweiler and

that she had the potential to disturb other residents of the apartment given her tendency to bark. Black negotiated with Rich to keep Tequila in the garage at the rear of the property to avoid disrupting the peace and quiet of the other tenants living in the building.

[¶31.] Although neither Black nor Wilson were deposed concerning the circumstances of the attack, both provided initial statements to police officers. Wilson told the officers that she commonly allowed Tequila to roam in the backyard while leashed and that the dog had never bothered other tenants. Wilson also stated that Tequila had never bit another human. And Black told the officers that he had previously warned Davies to stay away from Tequila when he was not home.

[¶32.] Although Davies stated after the incident that Tequila previously "went after" his dog, he never complained to GPHC about Tequila, and he did not believe Tequila's presence made the property unsafe. Davies could not remember whether Black had warned him to stay away from Tequila, but he also did not dispute that Black may have done so prior to the attack. Davies otherwise stated that he had no concerns about Tequila's presence in the yard and that the bite itself was unexpected.

[¶33.] To determine if these undisputed facts establish that GPHC is entitled to judgment as a matter of law, our formulation of the negligence standard in *Rowland* is instructive because the critical inquiry depends upon whether GPHC had reason to believe an attack was likely to occur.[3] "[T]he question to be asked is

---

3. Although the relationship and circumstances giving rise to a duty in *Rowland* are different than they are here, the reasonable person standard we described

(continued . . .)

whether, as an ordinary, prudent person, [GPHC] would have foreseen the event that caused the injury and taken steps to prevent the injury." *Rowland*, 2003 S.D. 20, ¶ 11, 658 N.W.2d at 79.

[¶34.] In *Rowland*, we stated that determining the foreseeability of a dog bite involves an examination of "the kind and character of the particular animal concerned, the circumstances in which it is placed, and the purposes for which it is employed or kept." *Id.* ¶ 8, 658 N.W.2d at 78 (citing *Gehrts*, 2001 S.D. 10, ¶ 9, 620 N.W.2d at 778). In other words, the foreseeability of a dog bite "is dependent upon all the surrounding facts and circumstances . . . ." *Id.* (citing *Small*, 403 N.W.2d at 413).

[¶35.] In an attempt to establish the existence of a factual question on the issue of breach, Davies first points to the fact that Tequila is a Rottweiler. Davies does not develop this point further, however, and perhaps for good reason. As we stated in *Ridley*, "[t]he law in South Dakota does not support any such breed-specific standard of care[,]" 2019 S.D. 48, ¶ 18, 932 N.W.2d at 581–82, and Tequila's breed cannot, itself, support the foreseeability of the attack.

[¶36.] Davies also asserts that Tequila was "aggressive [in] nature[,]" but none of the undisputed facts or reasonable inferences drawn from them suggest that this is accurate. Although Davies stated that Tequila had previously "went after" his dog, we cannot accept that this single event could reasonably suggest that Tequila was aggressive toward humans. *See id.* ¶ 19, 932 N.W.2d at 582

_____

(. . . continued)
and applied in *Rowland* also governs our analysis in this case as we determine whether material facts are in dispute as to the question of breach.

(determining the dog's caretaker did not breach the duty of care based in part upon "only one noted instance of aggression . . . involv[ing] a fight with another dog . . . ."). And even if Rich or someone employed by GPHC had inspected the property on a regular basis, nothing in the record suggests those investigations would have revealed Tequila to be a danger.

[¶37.] Davies also claims that Tequila "was placed in circumstances where it had to be chained and garaged due to its' [sic] aggressive nature[.]" But this, too, is unsustainable based upon the undisputed facts. Although Black and Wilson kept Tequila on a leash and kenneled in the garage, we can make no reasonable inference that they did so because the dog was aggressive or dangerous. To the contrary, the undisputed facts indicate that the arrangement between Rich and Black to keep Tequila in the garage was solely to avoid disturbing the other tenants—not to prevent Tequila from attacking people.

[¶38.] Finally, Davies argues that Tequila's chronic barking creates an unresolved factual question relating to the likelihood of an attack. In his brief, Davies asserts that "constant barking is a dangerous propensity" and cites our decision in *Gehrts* for support of this proposition. However, this argument misstates the relevant passage from *Gehrts*.

[¶39.] In *Gehrts*, we held that "evidence of the owner's knowledge that . . . [the dog] constantly barked, *bared its teeth, and strained at its leash* is sufficient to establish dangerous propensities, absent an actual attack." 2001 S.D. 10, ¶ 8, 620 N.W.2d at 778 (emphasis added) (citing 4 Am. Jur. 2d Animals § 98 (1995)). However, we did not hold that knowledge of a dog's barking alone is sufficient to

establish the foreseeability that the dog might be dangerous. Tequila's barking may have made her an annoyance to the other tenants in the building, but that is much different from the inference that she possessed dangerous propensities that would have made the attack foreseeable to GPHC.

[¶40.]     Examining the totality of the undisputed facts in this case and construing them in a light most favorable to Davies, he has failed to demonstrate a triable issue on the question of whether GPHC breached its duty to exercise reasonable care to maintain the common area of its property in a safe condition. We affirm the circuit court's decision to grant summary judgment.

### *Owner or Keeper of a Vicious Dog*

[¶41.]     The text of SDCL 40-34-13 provides: "Any person owning or keeping a vicious dog as defined in §§ 40-34-13 to 40-34-15, inclusive, has committed a public nuisance . . . ." As relevant here, a vicious dog is defined as:

> Any dog which, on private property, when unprovoked, in a vicious or terrifying manner approaches in apparent attitude of attack, bites, or inflicts injury, or otherwise attacks a mailman, meter reader, serviceman, journeyman, delivery man, or other employed person who is on private property by reason of permission of the owner or occupant of such property or who is on private property by reason of a course of dealing with the owner of such private property.

SDCL 40-34-14(2). An owner or keeper of a dog found to be in violation of the statute is "subject to the provisions of §§ 21-10-5 and 21-10-9[,]" which provide a variety of remedies.[4]

---

4.     The text of SDCL 21-10-5 provides as follows:
          Remedies against any nuisance are:

                                                          (continued . . .)

[¶42.]     Davies argues that because GPHC allowed Black to keep Tequila in the garage on the property, GPHC was a keeper of the dog. Davies further claims that Tequila was a vicious dog as defined by the statute and that keeping Tequila was a violation of the statute, which constitutes negligence per se. We view this as a legal question of statutory interpretation, which we review de novo. *See City of Onida v. Brandt*, 2021 S.D. 27, ¶ 27, 959 N.W.2d 297, 303.

[¶43.]     We have previously held that "where a particular statutory or regulatory standard is enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred, and the plaintiff can establish his relationship to the statute, unexplained violation of that standard renders the defendant negligent as a matter of law." *Lovell v. Oahe Elec. Co-op.*, 382 N.W.2d 396, 397–98 (S.D. 1986). "The reason for this rule is that the statute or ordinance

---

(. . . continued)

    (1)    A civil action;
    (2)    Abatement; and
    (3)    In cases of public nuisance only, the additional remedy of indictment or information as prescribed by statute and rules relating thereto.

The provisions of SDCL 21-10-9 describe the civil action remedy of SDCL 21-10-5(1) in the following terms:

> The remedy by civil action against public nuisance may be maintained by any public body or officer authorized thereto by law or official duty, or by any private person if it is specially injurious to himself. Such remedy also may be used by any person whose property is injuriously affected or whose personal enjoyment is lessened by any nuisance public or private. In all such actions the nuisance may be enjoined, or ordered abated, and damages recovered in addition.

becomes the standard of care or conduct to which the reasonably prudent person is held." *Alley v. Siepman*, 87 S.D. 670, 674, 214 N.W.2d 7, 9 (1974).

[¶44.]    However, negligence per se is not synonymous with strict liability. The former is only "sufficient to prove such a breach of duty as will sustain an action for negligence brought by a person within the protected class if other elements of negligence concur." *Hendrix*, 2007 S.D. 73, ¶ 17, 736 N.W.2d at 849 (citation omitted).

[¶45.]    Here, the text of SDCL 40-34-13 states that the owning or keeping of a vicious dog is "a public nuisance." If a person is found in violation of the statute, that person is "subject to" general nuisance remedies including a "civil action" to abate the nuisance created by the vicious dog. Assuming, without deciding, that a violation of SDCL 40-34-13 could support a claim of negligence per se, Davies's argument is flawed in a more conspicuous way. That is, in order to be found in violation of the statute, one must be the owner or keeper of a vicious dog. The circuit court determined that GPHC was not the owner or keeper of Tequila, and we agree.

[¶46.]    The statute does not define the word "keeper," but consulting other persuasive authority provides some helpful guidance. Black's Law Dictionary defines "keeper" as "[s]omeone who has the care, custody, or management of something and who is legally responsible for it." *Black's Law Dictionary*, (11th ed. 2019). Tequila was not in the care or custody of GPHC. The dog was kenneled on GPHC's property in accordance with its negotiated lease agreement with Black, but Black and Wilson were responsible for the dog's care and custody. GPHC did not

feed, water, walk, groom or otherwise care for Tequila, and the dog's mere presence on GPHC's leased property does not render GPHC a keeper of the dog under SDCL 40-34-13.

[¶47.] Courts from several other jurisdictions have reached the same conclusion applying similar statutes, and we find their reasoning persuasive. *See, e.g., Bright v. Maznik*, 396 P.3d 1193, 1197 (Idaho 2017) ("[P]roperty ownership alone does not constitute harboring of an animal."); *Malone by Bangert v. Fons*, 580 N.W.2d 697, 706 (Wis. Ct. App. 1998) ("[A] landlord does not become a harborer of a tenant's dog merely by permitting his or her tenant to keep the dog."); *Steinberg v. Petta*, 501 N.E.2d 1263, 1266 (Ill. 1986) ("The defendant was an absentee landlord, and he did not have the tenants' dog in his care, custody, or control; he simply allowed the tenants to have a pet on the premises, and by no fair inference can he be deemed to have harbored or kept the animal . . . .").

[¶48.] Finally, even if we were to accept Davies's argument that GPHC was a keeper of Tequila, Davies was not a member of the class of persons the statute was designed to protect. The statute defines "vicious dog" not only by the actions of the dog itself, but also by the category of persons who come in contact with the dog. It begins by listing a series of service and delivery occupations, none of which include Davies. The remainder of the statute is admittedly less precise, but nevertheless seems to denote a small class of persons who commonly enter private property given the nature of their work—not tenants. In his brief, Davies does not seriously attempt to reconcile the definitions in SDCL 40-34-14(2) with his status as GPHC's tenant.

[¶49.]     We conclude, therefore, that the circuit court did not err when it granted GPHC's summary judgment motion on Davies's claim of negligence per se.

### Rule 56(f) Affidavit

[¶50.]     Under our rules of civil procedure "a party opposing a motion for summary judgment is entitled to conduct discovery when necessary to oppose the motion." *Stern Oil Co. v. Border States Paving, Inc.*, 2014 S.D. 28, ¶ 26, 848 N.W.2d 273, 281 (quoting *Dakota Indus., Inc. v. Cabela's.com, Inc.*, 2009 S.D. 39, ¶ 6, 766 N.W.2d 510, 512).  Rule 56(f) specifically states that if a party "cannot for reasons stated present by affidavit facts essential to justify his opposition [to summary judgment], the court may refuse the application for judgment or may order a continuance to permit . . . depositions to be taken . . . ."

[¶51.]     In support of a Rule 56(f) affidavit requesting a continuance, the party opposing summary judgment must "show[ ] how further discovery will defeat the motion for summary judgment."  2014 S.D. 28, ¶ 26, 848 N.W.2d at 281.  We have defined this burden in the following terms:

> To make this showing, the Rule 56(f) affidavit must include identification of "the probable facts not available and what steps have been taken to obtain" those facts, "how additional time will enable [the nonmovant] to rebut the movant's allegations of no genuine issue of material fact[,]" and "why facts precluding summary judgment cannot be presented" at the time of the affidavit.

*Id.* ¶ 26, 848 N.W.2d at 281–82 (alterations in original) (quoting *Anderson v. Keller*, 2007 S.D. 89, ¶ 32, 739 N.W.2d 35, 43 (Zinter, J., concurring)).  A circuit court's decision to grant or deny a continuance under Rule 56(f) is reviewed for an abuse of discretion.  *Id.* ¶ 24, 848 N.W.2d at 281.

[¶52.]     Here, Davies submitted a Rule 56(f) affidavit several days prior to the hearing on GPHC's summary judgment motion. Davies claims that the circuit court abused its discretion in granting GPHC's motion prior to allowing him to depose Black and Wilson. However, Davies's affidavit falls well short of the requirements of Rule 56(f).

[¶53.]     The entirety of Davies's affidavit provides:

1.     Plaintiff would like to depose third party defendants
       1) Michelle L. Wilson; and
       2) Jay M. Black

2.     As yet, the Third-Party Defendants have not had the [sic] depositions Noticed, nor have they been subpoenaed for their testimony.

3.     The [c]ourt should have this information available to the [c]ourt prior to ruling on GPHC, LLC's *Motion for Summary Judgment.*

[¶54.]     These cursory, "non-particularized" statements do not satisfy the standard for granting a continuance under Rule 56(f). *Id.* ¶ 27, 848 N.W.2d at 282. Davies identifies no facts to be discovered, what prior steps had been taken to seek them, or how additional time to take the depositions of Black and Wilson would have allowed him to contest the undisputed material facts contained in GPHC's motion for summary judgment. Therefore, the circuit court did not abuse its discretion by denying Davies's motion under Rule 56(f).

## Conclusion

[¶55.]     Considering all the undisputed facts in a light most favorable to Davies and drawing all the inferences therefrom in his favor, we conclude the circuit court did not err when it granted summary judgment to GPHC as to Davies's general negligence and negligence per se claims. *See Zochert*, 2018 S.D. 84, ¶ 19, 921

N.W.2d 479, 486 (citation omitted) ("If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper."). Nor did the court abuse its discretion in denying Davies's motion under Rule 56(f). We affirm.

[¶56.]    JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.