#30664-aff in pt & rev in pt-MES
**2025 S.D. 47**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

ANDERSON INDUSTRIES, LLC,     Plaintiff and Appellee,

  v.

THERMAL INTELLIGENCE, INC., a
Canadian corporation,       Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
DAY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MARSHALL C. LOVRIEN
Judge

* * * *

TATUM O'BRIEN of
O'Keeffe O'Brien Lyson Ltd.
Fargo, North Dakota      Attorneys for defendant
           and appellant.


JONATHAN A. HEBER
NICHOLE J. MOHNING of
Cutler Law Firm, LLP
Sioux Falls, South Dakota    Attorneys for plaintiff
           and appellee.

* * * *

ARGUED
OCTOBER 2, 2024
OPINION FILED **08/13/25**

#30664

SALTER, Justice

[¶1.] Anderson Industries, LLC (Anderson) commenced this action to collect the balance of the purchase price for 30 industrial heaters it claims Thermal Intelligence, Inc. (TI) agreed to buy. TI denied the existence of a contract, claiming discussions about the 30 heaters were simply part of broader negotiations between the parties that ultimately failed to yield a comprehensive agreement. Both parties moved for summary judgment, and the circuit court granted Anderson's motion. The court determined there were no disputed issues of material fact as to the agreement to purchase the 30 heaters and, despite TI's complaints about some of the heaters, it did not reject them as nonconforming goods. TI appeals, and we affirm in part, reverse in part, and remand for further proceedings.

## Factual and Procedural Background

[¶2.] TI is a Canadian corporation that specializes in selling industrial heaters. In 2018, TI sought a new supplier for its retail heater offering and negotiated with Anderson, a South Dakota limited liability company, to custom manufacture 30 K2 model V1.0 industrial heaters (V1.0 heaters).[1] Anderson used TI's technical specifications to custom build the V1.0 heaters, which bore TI's logo and insignia. TI paid for the heaters, which were then sold to an affiliated company.

[¶3.] After completing the initial order, Anderson still had a sufficient supply of components and parts to build another 30 V1.0s. The V1.0s, however, did

---

1. All the heaters referred to are different versions (V1.0, V1.5, V1.7, V2.0) of Anderson's K2 product line.

not perform in the field as the parties had hoped. Recognizing that an additional 30 V1.0s would likely be difficult to sell, Anderson proposed using the previously purchased surplus parts to build 30 V1.5 models, which would incorporate design modifications to the V1.0 heater.

[¶4.]		In 2019, the parties began discussing the potential V1.5 heater. These discussions occurred amid ongoing negotiations regarding other future heater models, namely the future development of V1.7 and V2.0 models, timelines, and pricing, as well as TI's potential purchase of Anderson's intellectual property (IP) rights to the K2 product line.[2]

[¶5.]		On July 19, 2019, Dan Ewert, acting on behalf of Anderson, emailed a proposal to TI's president, Brian Tiedemann, listing four enumerated items, which allowed the parties to make corresponding numeric references in subsequent emails, including the following excerpted email discussions:

> Ewert: It seems that we've tied the price on the V1.5 to the acquisition of the IP and designs and this has complicated the negotiations, rather than simplifying them. It appears that IP and Designs are a longer-term discussion and we should continue that, but for now, time is of the essence for both our companies, so here's a fourth option with its subsets.
>
> 1. Lower our V1.5 selling price to $69,500 on all 30 units, if you agree to provide a [purchase order] for all 30 units at a down

2.	The record contains copies of several email communications between the parties in which the principals of TI and Anderson express a desire to work "collaboratively" to develop a flameless industrial heater line. The parties also frequently refer to themselves and each other as "partners." But these terms seem to be used informally to reflect an effort to foster a positive business relationship; neither party has suggested that Anderson and TI were actually engaged in a partnership or joint venture or that their relationship was anything other than that of a purchaser and a manufacturer seller.

payment of 20%. . . . On receipt of [the purchase order] and down payment it is 10 weeks until we ship the first units. . . .

* * * *

Tiedemann: We agree the timing of this negotiation is brutal, so in the efforts of finding a path forward, we can agree to the following:

1) We will issue a [purchase order] for 21 units at a price of $69,500 with a downpayment of 20%, and issue subsequent [purchase orders and] downpayments immediately upon receiving commitment from customers.

* * * *

Ewert: We agree, with the stipulation that . . . no V1.7s are built until all 30 V1.5s have been sold.

* * * *

Tiedemann: 1) We agree. Our intention all along was that we would exhaust the V1.5's first.

[¶6.]        Although they never materialized, the other proposed terms covered a larger scope.  For instance, the second item from Ewert's proposal concerned a credit against the purchase price of the 30 V1.5 heaters *if* TI purchased Anderson's IP rights; it never did.  The third item in Ewert's proposal discussed pricing for a V1.7 model, and the fourth item concerned the design of a V2.0 model.  Both were prospective in nature.

[¶7.]        As to the more immediate topic of the 30 V1.5 heaters, Tiedemann further acknowledged the agreement on July 20, 2019, when he emailed Anderson's president, Kory Anderson: "I am pleased we were able to reach an agreement to liquidate the Anderson inventory and take care of the immediate needs of [TI] customers."

#30664

[¶8.] The following Monday, July 22, 2019, TI wired Anderson $291,900, which equals 20% of the purchase price for 21 units. Anderson subsequently began production of the 21 V1.5 heaters. In his deposition testimony, Tiedemann confirmed that TI was "aligned" with purchasing 21 units at $69,500 with a 20% downpayment because they already had 21 sales lined up to retail customers. Tiedemann later confirmed the purchase of the remaining nine heaters in an August 2 email stating, "Without having firm offers 'in-hand' we will still order the remaining 1.5's."

[¶9.] This, however, was the extent of the parties' consensus. Tiedemann's August 2, 2019 email confirming the purchase of all 30 V1.5 heaters came in the midst of continuing, but unfruitful, discussions between the parties about future models, pricing, and an IP purchase.

[¶10.] TI subsequently paid Anderson $125,100 on August 22, 2019, which equals 20% of the remaining nine V1.5 heaters at a purchase price of $69,500 apiece. The payment prompted Anderson to begin production of the final nine V1.5 heaters. At this point, TI's July 22 and August 22 payments totaled $417,000, which equaled 20% of the purchase price for all 30 V1.5 heaters.

[¶11.] TI proposed a payment plan on October 3, 2019, that acknowledged the $417,000 it had already paid toward the V1.5s and committed to a minimum of $200,000 in additional payments per week to pay for the 30 V1.5 heaters TI would be receiving. Specifically, TI proposed $100,000 payments twice per week, with the option to accelerate the schedule based on receivables it collected through heater sales. TI made the first week's payment of $200,000, and Anderson signaled its

agreement to the payment arrangement, telling TI that it "will move forward with shipment releases based on accountability to [TI's] proposed payment schedule."

[¶12.] Pursuant to its plan, TI made the following payments totaling $750,000:

| | |
|---|---|
| October 3, 2019: | $200,000 |
| October 7, 2019: | $100,000 |
| October 10, 2019: | $100,000 |
| October 15, 2019: | $100,000 |
| October 15, 2019: | $100,000 |
| October 21, 2019: | $100,000 |
| October 24, 2019: | $ 50,000 |
| **Total** | **$750,000** |

[¶13.] Following the partial payment on October 24, Anderson received no further payments from TI. At that point, TI's payments totaled $1,167,000 of the total $2,085,000 purchase price for the 30 V1.5 heaters.

[¶14.] After three weeks without receiving payment, Anderson informed TI on November 15, 2019, that it would not release the eighteenth V1.5 heater, which was scheduled for shipment on November 18. An Anderson representative notified Tiedemann via email that Anderson "can only extend a credit limit of $200,000 on [its] heater shipments." The Anderson representative stated that the company "need[ed] to receive some payment[s] . . . in order to let the heater go out as scheduled." TI made no further payments, and Tiedemann was notified the following Monday that the heater scheduled for pick-up that day by Tiedemann's contracted carrier was put on hold. This prompted the following terse email exchange:

> Tiedemann: I notified Kory on Friday that if the heater wasn't released[,] we would be terminating our relationship with Anderson effective immediately. The heater was not released so

> we have notified our customers that all remaining orders have been cancelled.
>
> * * * *
>
> Anderson: Unfortunately[,] it's not as easy as walking away at this point as we still have a handful of units being custom built to your order in process. To cancel . . . at this stage would be significant restocking fees per standard protocol.
>
> * * * *
>
> Tiedemann: We are well aware of our obligations and re-stocking fees are not part of them. You are free to sell whatever remaining stock you have to whomever you choose. Our account is officially and permanently closed.

[¶15.]      Later on November 18, after notifying Anderson that TI was "terminating [their] relationship," Tiedemann sent another email in which he complained of ongoing performance issues with the Anderson heaters. Tiedemann described Anderson's refusal to release the heaters without payment earlier that day as the "last straw."

[¶16.]      The parties' emails indicate that the performance issues with the V1.5 heaters were not new and had surfaced in late September and early October. TI noted a customer's report of two V1.5 heaters that would not start and another instance of a customer listing concerns with the product. TI ultimately decided to undertake the repairs itself, citing frustration with Anderson's lead times for parts. Significantly, however, TI did not reject or return any of the heaters. Instead, despite the performance issues it identified, TI continued to accept the V1.5 heaters,

continued to sell them, and even sought to purchase more, that is, until Anderson refused to release the eighteenth heater.[3]

[¶17.] Anderson filed suit alleging two counts of breach of contract: the first arising from the July 19, 2019 agreement for 21 V1.5 heaters; and the second from the August 2, 2019 agreement for the remaining nine units. TI answered, denying any liability and asserting several affirmative defenses, including the claim that the parties never formed a contract. Alternatively, to the extent a contract existed, TI claimed its performance was excused by quality issues with the V1.5 heaters, which TI alleged constituted Anderson's prior breach. Both parties moved for summary judgment.

[¶18.] In its motion, Anderson asserted it was entitled to the remaining balance of $918,000 plus interest, relying on principles set out in Article 2 of the Uniform Commercial Code (UCC), which is codified within SDCL chapter 57A-2. Specifically, Anderson emphasized that TI never exercised its right to reject goods under SDCL 57A-2-602, and as a result, TI's premature termination could not be excused by its complaints about the heaters' performance. Regarding damages, Anderson asserted that no secondary market exists because the heaters were custom-built for TI.

[¶19.] In contrast, TI's cross-motion for summary judgment rested largely on

---

3. Anderson asserted that it had constructed all 30 of the V1.5 heaters and stored the remaining 13 V1.5 heaters in a warehouse in Webster, where they apparently remain.

common law concepts and not the UCC.[4]  Focusing on the overlapping negotiations, TI asserted principally that no contract was ever formed.  Alternatively, it maintained that any breach was excused by Anderson's prior breach and that Anderson failed to mitigate its damages.

[¶20.]     The circuit court conducted a hearing and subsequently issued an oral ruling denying TI's motion and granting Anderson's motion.  The court determined that there were "no genuine issues of material fact as to the argument that [TI] entered into an agreement with Anderson . . . to purchase 30 V1.5 heaters at a price of $69,500."  The court also concluded it was undisputed that TI first breached the agreement by failing to make payments pursuant to the payment plan and also breached it when TI terminated the entire agreement on November 18, 2019.  Further, the court concluded that TI "failed to cite any evidence in the record to support its claim [that Anderson failed to mitigate its damages]."  On the other hand, the court observed that Anderson "presented evidence . . . that there is no secondary market[,]" it custom-manufactured the heaters to TI's specifications, and "[took] affirmative steps to mitigate its damages by storing the heaters for four years at its own cost."

---

4.    TI also raised a prior breach argument under the UCC in its summary judgment submissions, arguing that performance issues constituted a breach of the implied warranty of merchantability under SDCL 57A-2-314. Anderson, however, contended that the claim was not presented because it had not been pled, and the circuit court did not expressly address TI's warranty of merchantability theory.  TI has not pursued the argument on appeal.

[¶21.]    Despite not expressly referencing the UCC in its oral ruling, the circuit court adopted the essence of Anderson's argument. The court subsequently rejected each of TI's common law arguments.

[¶22.]    TI appeals the circuit court's decision to grant Anderson's motion for summary judgment. In TI's view, there are genuine issues of material fact as to whether an enforceable contract was created between the parties for the 30 V1.5 heaters. Alternatively, if we determine that a contract existed, TI asserts the court erred in finding that it breached the agreement. Additionally, TI argues that the court erred in its determination of damages.

## Analysis and Decision

### *Summary judgment and the UCC*

[¶23.]    "We review a circuit court's entry of summary judgment under the de novo standard of review." *Healy Ranch, Inc. v. Healy*, 2022 S.D. 43, ¶ 17, 978 N.W.2d 786, 793 (quoting *Estate of Stoebner v. Huether*, 2019 S.D. 58, ¶ 16, 935 N.W.2d 262, 266). "In reviewing a grant or a denial of summary judgment under SDCL 15-6-56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law." *Davies v. GPHC, LLC*, 2022 S.D. 55, ¶ 17, 980 N.W.2d 251, 258 (quoting *Ridley v. Sioux Empire Pit Bull Rescue, Inc.*, 2019 S.D. 48, ¶ 11, 932 N.W.2d 576, 580). "We view the evidence most favorably to the nonmoving party and resolve reasonable doubts against the moving party." *Id.* (quoting *Burgi v. East Winds Ct., Inc.*, 2022 S.D. 6, ¶ 15, 969 N.W.2d 919, 923). "We

will affirm the circuit court's summary judgment decision if there exists any basis which supports the ruling of the trial court." *Id.* (citation modified).

[¶24.]    At the outset, we note that this dispute arises over the sale of goods, implicating Article 2 of the UCC, which is codified within SDCL chapter 57A-2. *See* SDCL 57A-2-102(1) (providing that SDCL 57A-2 "applies to transactions in goods"). When a contract for the sale of goods is formed, the UCC provides a comprehensive set of rules addressing the rights and obligations of the parties, and the related application of these statutory rules often present questions of fact. *See Pomerantz Paper Corp. v. New Cmty. Corp.*, 25 A.3d 221, 233–34 (listing delivery, acceptance, and rejection of goods as questions of fact under the UCC); *Moe v. John Deere Co.*, 516 N.W.2d 332, 335 (S.D. 1994) (noting that the existence of breach under the UCC is a question of fact). "But that is not to say that all factual questions are *disputed*." *Davies*, 2022 S.D. 55, ¶ 28, 980 N.W.2d at 261. Nor are all disputed facts *material*. *See Niesche v. Wilkinson*, 2013 S.D. 90, ¶ 9, 841 N.W.2d 250, 253–54 ("A disputed fact is not 'material' unless it would affect the outcome of the suit under the governing substantive law[.]") (quoting *A-G-E Corp. v. State*, 2006 S.D. 66, ¶ 14, 719 N.W.2d 780, 785)).

[¶25.]    Accordingly, "even factual determinations may be appropriate for summary judgment 'if the pleadings, depositions, answers to interrogatories, . . . together with the affidavits, if any, show that *there is no genuine issue as to any material fact* and that the moving party is entitled to judgment as a matter of law." *Davies*, 2022 S.D. 55, ¶ 29, 980 N.W.2d at 261 (quoting *Stern Oil Co. v. Brown*, 2012 S.D. 56, ¶ 8, 817 N.W.2d 395, 398). "To successfully resist summary judgment, the

non-moving party 'must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy.'" *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . .").

### *Existence of an agreement for 30 V1.5 heaters*

[¶26.]        "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." SDCL 57A-2-204(1). Further, "[a]n agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined." SDCL 57A-2-204(2).

[¶27.]        Here, there are no issues of material fact concerning the existence of a contract for 30 V1.5 heaters. Initially, Anderson offered to sell 30 V1.5 heaters at a price of $69,500 per unit with a lead-in time of ten weeks upon receipt of first payment and a downpayment of 20%. In a July 19, 2019 email, Tiedemann wrote that TI would issue purchase orders and downpayments for 21 of the 30 V1.5 units to be followed by purchase orders for the remaining units "immediately upon receiving a commitment from customers." In his deposition, Tiedemann testified that TI agreed on the purchase order of 21 units "[b]ecause that's how many [TI] had already sold." And TI's conduct was consistent with the agreement. It promptly wired $291,900, which is 20% of the purchase price of 21 units at $69,500. As a result, Anderson performed by building the first 21 V1.5 heaters.

[¶28.] The fate of the nine heaters seemingly not included in TI's initial purchase was resolved by subsequent events which are equally undisputed. On August 2, Tiedemann emailed Kory Anderson and explained that, despite the fact that TI was unable to accept Anderson's larger proposal for the sale of the K2 heater line, IP rights, and future heater models, "we will *still* order the remaining 1.5's" despite not yet "having firm orders 'in-hand[.]'" (Emphasis added.)[5]

[¶29.] And on August 22, 2019, TI paid Anderson $125,100, which equals a 20% downpayment for the remaining nine V1.5 heaters using a unit price of $69,500. Upon receipt of TI's downpayment, Anderson began production of the remaining nine V1.5 heaters. In other words, TI ultimately agreed to buy all 30 heaters in accordance with the July 19 contract and later even proposed a payment plan.

[¶30.] The plain fact that evidence of the parties' agreement relating to all 30 V1.5 heaters may have come at different stages and involved a combination of writings and conduct is not significant. The UCC specifically allows for circumstances like these by providing that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." SDCL 57A-2-204(1). The UCC further elevates the substance of the contract over the formality of a discrete point of formation by recognizing that "[a]n agreement sufficient to constitute a

---

5. In the July 19 series of emails, Tiedemann wrote, "Our intention all along was that we would exhaust the V1.5's first."

contract for sale may be found even though the moment of its making is undetermined." SDCL 57A-2-204(2).

[¶31.] TI's principal argument on appeal is that "multiple essential terms were left open" and, as a result, an enforceable contract was not established.[6] But under the UCC, the fact that terms are left open is most often associated with the existence of a contract, not its absence. The text of SDCL 57A-2-204(3) says as much: "Even though one or more terms are left open[,] a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." The UCC comment explains the rationale:

> If the parties intend to enter into a binding agreement, this subsection recognizes that agreement as valid in law, despite missing terms, if there is any reasonably certain basis for granting a remedy. The test is not certainty as to what the parties were to do nor as to the exact amount of damages due the plaintiff. Nor is the fact that one or more terms are left to be agreed upon enough of itself to defeat an otherwise adequate agreement. Rather, commercial standards on the point of "indefiniteness" are intended to be applied, this Act making provision elsewhere for missing terms needed for performance, open price, remedies and the like.

> The more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement, but their actions may be frequently conclusive on the matter despite the omissions.

---

6.  TI also makes what it describes as an alternative argument that presumes the formation of a contract, but it is essentially the same argument as it makes against enforceability. Instead of arguing that the allegedly unresolved terms preclude enforceability, TI argues alternatively that disputed issues of material fact concerning these additional terms preclude summary judgment.

SDCL 57A-2-204(3), cmt.[7]

[¶32.] Here, the parties' words and conduct conclusively establish that they reached an agreement for the sale of the 30 V1.5 heaters and, further, that the other items of negotiation were not open terms at all; they were simply separate items on which the parties failed to reach mutual agreement. TI's all-or-nothing argument is unsupported by the UCC or the record.

[¶33.] The undisputed facts make clear that even amid unsuccessful negotiations concerning the more ambitious, far-reaching terms of future heater development and the sale of IP and the K2 heater line, Tiedemann wrote in his August 2, 2019 email that TI "will *still* order the remaining 1.5's" despite not yet "having firm orders 'in-hand.'" (Emphasis added.) Tiedemann acknowledged the nature of separate and certain agreements for the 30 heaters in his deposition testimony:

> I just wanted to say that our intention always was to try and sell all of the 30 units that Anderson had partly because we wanted to get rid of inventory for Kory and partly because we knew we couldn't move to another – whatever stage that looked like, which had not been defined yet, but we knew we could not get to the next stage until those 30 were sold because they were the cash flow bottleneck so our intention was to sell the 30 units all along. . . . We committed to the 21. And, hey, . . . maybe that down payment was for the other 9. I don't know. I honestly don't remember it, but I will admit it's quite coincidental in the amount of it, *but it also was our intention to buy those—all 30 units.* That was our goal and that was our intention.

---

7.   "Although the comments to the [UCC] were not adopted by the South Dakota Legislature, this Court has found them to be a helpful guide to interpreting the text of the Code." *Stern Oil Co.*, 2012 S.D. 56, ¶ 18 n.7, 817 N.W.2d at 402 n.7 (citing *Estate of Klauzer*, 2000 S.D. 7, ¶ 33 n.5, 604 N.W.2d 474, 481 n.5).

(Emphasis added.)

[¶34.] There are no genuine disputed material facts regarding the parties' agreement for 30 V1.5 heaters at $69,500 per unit. The circuit court correctly determined the existence of a contract and granted summary judgment on this issue.

*Acceptance and substantial impairment*

[¶35.] Generally, a "buyer is [obligated] to accept and pay in accordance with the contract." SDCL 57A-2-301. The UCC establishes three distinct bases that individually satisfy acceptance:

> (1) Acceptance of goods occurs when the buyer
>
> (a) After a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
>
> (b) Fails to make an effective rejection (subsection (1) of § 57A-2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>
> (c) Does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

SDCL 57A-2-606(1)(a) to (c); *see also* SDCL 57A-2-106(2) (defining goods as "'conforming' . . . when they are in accordance with the obligations under the contract").

[¶36.] To make an effective rejection of goods, the buyer "must [reject] within a reasonable time after their delivery" and "seasonably notif[y] the seller." SDCL 57A-2-602(1). However, a buyer's right to reject nonconforming goods differs based

-15-

on whether the contract calls for single delivery, *see* SDCL 57A-2-307, or is an "installment contract," *see* SDCL 57A-2-612.

[¶37.] Contracts, like the one here, that "require[] or authorize[] the delivery of goods in separate lots to be separately accepted," are considered "installment contracts." SDCL 57A-2-612(1).[8] The UCC allows installment contract buyers to "reject any installment which is nonconforming if the nonconformity substantially impairs the value of that installment and cannot be cured[.]" SDCL 57A-2-612(2); *cf.* SDCL 57A-2-601 (articulating the UCC's "perfect tender" rule, which permits a buyer to reject goods that "fail *in any respect* to conform to the contract" (emphasis added)). "But the aggrieved party reinstates the contract if he accepts a nonconforming installment without seasonably notifying of cancellation[.]" SDCL 57A-2-612(3).

[¶38.] The buyer's election to accept or reject the goods is a fateful one, but for installment contracts, not necessarily a final one. The UCC recognizes the incremental nature of these contracts and states that "[w]henever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole." *Id.* In other words, the "defects in prior installments are cumulative in effect, so that acceptance does not wash out the defect 'waived.'" *Id.*, cmt. 6. "'Substantial impairment,' as explained by the official commentary to section 2-612(2), involves consideration of the quality,

---

8. Anderson states that this was an installment contract, and TI has not disputed the claim, which appears to be correct. The parties' communications contained in the record make clear that both Anderson and TI understood the heaters would be delivered in separate lots.

quantity, and assortment of goods, as well as the time frame contemplated by the contract." *Design Plus Store Fixtures, Inc. v. Citro Corp.*, 508 S.E.2d 825, 829–30 (N.C. Ct. App. 1998) (citing UCC § 2-612, cmt. 4). Moreover, "the question of 'substantial impairment' . . . presents a question of fact." *Bill's Coal Co. v. Bd. of Pub. Utils.*, 887 F.2d 242, 247 (10th Cir. 1989) (citing *Cherwell–Ralli, Inc. v. Rytman Grain Co., Inc.*, 433 A.2d 984, 986 (Conn. 1980)); *see Integrity Bio-Fuels, LLC v. Musket Corp.*, No. 13-cv-00768, 2015 WL 1417849, at *12 (S.D. Ind. Mar. 27, 2015) (denying summary judgment and observing that substantial impairment determination "necessarily requires the trier of fact to weigh the evidence"); *Asi Indus. GmbH v. MEMC Elec. Materials, Inc.*, No. 06CV951, 2008 WL 413819, at *3 (E.D. Mo. Feb. 13, 2008) ("Whether there has been a 'substantial impairment' of an installment contract is generally a question of fact."); *Extrusion Painting, Inc. v. Awnings Unlimited, Inc.*, 37 F. Supp. 2d 985, 997 (E.D. Mich. 1999) (same).

[¶39.]     Here, TI accepted the 17 V1.5 heaters; it did not reject them. However, there is an undisputed record of TI's complaints about the performance of at least some of the heaters. As early as September 17, 2019, TI communicated, in writing, its concerns to Anderson regarding its ability to deliver conforming heaters on schedule with agreed-upon support services. On October 28, TI notified Anderson that some of the heaters would not start, including two heaters delivered in North Dakota. TI told Anderson that TI's technician would work "on units in Canada experiencing the same issue" and asked Anderson to resolve the problem with the two heaters in North Dakota. Anderson's representative responded that he was not sure if "traveling someplace to perform repairs is something that fits into [his]

schedule this week at Anderson[.]" In other emails on October 28, TI expressed its frustration about the lack of product support and delays in resolving customer issues, stating: "If we ever want to get paid I suggest we get these issues resolved ASAP or equipment will be coming back to the factory instead of being delivered from it."

[¶40.] Construing the facts in the light most favorable to TI, there appear to be genuine issues of material fact relating to several key UCC questions, including the accuracy of TI's claims relating to defects in the heaters and the related determination of whether the alleged defects for the accepted heaters "substantially [impaired] the value of the whole contract" thereby permitting TI to cancel the remaining thirteen installments.[9] SDCL 57A-2-612(3); *see also Design Plus*, 508 S.E.2d at 830 ("Once a non-conforming installment substantially impairs the installment contract as a whole, the aggrieved party has no duty to provide an opportunity to cure the defects of future installments; rather, the buyer has an immediate right to cancel the entire contract.").

[¶41.] There is, however, a complication. TI has not oriented its arguments to the UCC or SDCL 57A-2-612 either before the circuit court or on appeal. Still, relying upon more generic contract principles, TI has argued that Anderson delivered defective heaters which "justified . . . suspending payments to [Anderson] and subsequently canceling any remaining orders[.]" Because there is no dispute that the UCC governs this installment contract, we must therefore apply the

---

9.    Also, TI's cancellation could only be effective under SDCL 57A-2-612(3) if its notice of cancellation was seasonable.

governing law. *See Scotlynn Transp., LLC v. Plains Towing & Recovery, LLC*, 2024 S.D. 24, ¶ 17, 6 N.W.3d 671, 676 ("Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied." (citation omitted)).

[¶42.] Viewed in the light most favorable to TI, this argument sufficiently raises a genuine issue of material fact as to whether the defects it identified for the accepted heaters had accumulated to a critical tipping point at which TI could claim that Anderson had breached the contract because the value of the whole contract had become substantially impaired. *See* SDCL 57A-2-612(3). Given this determination of the breach issue, we do not reach the question of damages, which remains open on remand.

**Conclusion**

[¶43.] The circuit court correctly determined that Anderson and TI did have a contract for the sale of 30 heaters, as detailed above. However, questions of material fact regarding breach remain for resolution at a trial. We, therefore, affirm the circuit court in part, reverse in part, and remand the case for further proceedings.[10]

[¶44.] JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.

---

10. In its requested relief, TI has sought reassignment to a different circuit court judge on remand. This request is unfounded and based upon nothing more than the existence of an adverse decision, as counsel confirmed at oral argument. The request is denied.