#30776-aff in pt & rev in pt-PJD
**2026 S.D. 4**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JUSTIN HAMER and KIM HAMER,                    Plaintiffs and Appellants,

    v.

PAUL DUFFY and CORNERSTONE
POURED FOUNDATIONS, INC.,                    Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JOHN R. PEKAS
Judge

* * * *

DANNY R. ELLIS of
Truck Wreck Justice, PLLC
Chattanooga, Tennessee

SCOTT G. HOY
JAMES L. HOY of
Hoy Trial Lawyers, Prof. LLC
Sioux Falls, South Dakota                    Attorneys for plaintiffs and
                                             appellants.


MARK J. ARNDT
TYLER A. BRADLEY of
Evans, Haigh & Arndt, LLP
Sioux Falls, South Dakota                    Attorneys for defendants and
                                             appellees.

* * * *

ARGUED
AUGUST 27, 2025
OPINION FILED **02/04/26**

#30776

DEVANEY, Justice

[¶1.]    Justin Hamer and Paul Duffy were involved in an automobile accident on April 8, 2019.  At the time of the accident, Duffy was acting in the scope and course of his employment with Cornerstone Poured Foundations, Inc.  Justin and his wife Kim brought suit against both Duffy and Cornerstone (collectively Cornerstone), alleging Duffy was negligent in causing the accident, that he suffered injuries as a result, and that Cornerstone is liable for Duffy's negligent acts under the doctrine of respondeat superior.  Cornerstone denied negligence on Duffy's part and asserted that Hamer was contributorily negligent.

[¶2.]    Prior to trial, the circuit court granted Cornerstone's motion to exclude the testimony of two of Hamer's expert witnesses on the grounds that their testimony would not be helpful to the jury.  On November 22, 2022, two weeks before trial was to begin on December 6, 2022, Hamer moved to amend his complaint, seeking to assert claims for direct negligence against Cornerstone and to assert violations of the Federal Motor Carrier Safety Regulations.  The circuit court denied the motion to amend and later denied Hamer's requested jury instruction that pertained to the Federal Motor Carrier Safety Regulations.  Trial was eventually held in May 2024 and the jury concluded Duffy was negligent, but that Hamer was contributorily negligent, more than slight, and therefore, awarded him no damages.  Hamer now appeals, claiming the circuit court abused its discretion when ruling on these issues.  We affirm in part and reverse in part.

-1-

## Factual and Procedural History

[¶3.]     On April 9, 2019, Hamer was traveling west on 271st Street near the intersection of Interstate 29 (I-29), which has multiple lanes of east/west travel and multiple lanes of entry and exit onto I-29. The intersection is controlled by a traffic signal, which at the time, was malfunctioning and flashing red for all directions of traffic. Hamer claims that he stopped at the red light and then proceeded into the intersection. At the same time, Duffy, who was driving a truck for his employer Cornerstone, was traveling east on 271st Street. After stopping at the red light controlling his lane of travel, he proceeded into the intersection, turned left toward the on ramp for I-29 North, and struck Hamer's pickup. The responding law enforcement officer interviewed both Hamer and Duffy. Each driver claimed to stop at the flashing traffic signal, and each claimed to have the right of way. Because there were no other witnesses to the collision at the scene who could shed further light on what occurred, the officer could not determine who was at fault and, accordingly, issued no citations.

[¶4.]     By service of a summons and complaint dated March 13, 2020, Hamer brought suit against Duffy and Cornerstone, alleging Duffy was negligent by failing to keep a proper lookout; failing to maintain control of his vehicle; failing to drive a reasonable speed, stay vigilant, awake, and alert; failing to take steps necessary to avoid the collision; and failing to yield the right of way. Hamer sought damages for personal injuries, property damage, loss of earning capacity, and pain and suffering. Hamer's wife Kim asserted a claim for loss of consortium. Cornerstone timely answered, denying that Duffy was negligent, but admitting Duffy was in the course

and scope of his employment, and asserting contributory negligence as an affirmative defense.[1] The parties stipulated to a scheduling order, which specified the following deadlines: disclosure of expert witnesses – May 17, 2021 (plaintiffs) and July 15, 2021 (defendants); completion of discovery – November 15, 2021; and substantive motions – November 30, 2021.

[¶5.] Among others, Hamer identified as expert witnesses, Adam Grill and Michael DiTallo. Grill was to offer opinions based largely on the Federal Motor Carrier Safety Regulations (FMCSRs) and the Commercial Driver's License (CDL) manual, relating to "[g]eneral trucking industry customs, practices, and standards"; "performance of the commercial motor vehicle operators"; the "motor carrier management practices of the motor carriers involved"; and "[d]eterminations of accident preventability from a commercial trucking industry standpoint." DiTallo's opinions related to his assessment of Duffy's driving conduct, namely, the time he had to react, whether he was situationally inattentive, and whether he violated a statute by failing to yield.

[¶6.] Cornerstone moved to exclude testimony from Grill and DiTallo on the ground that neither expert had "testimony to offer that was outside of a jury's common sense." Cornerstone argued the matters those experts proposed to testify about were not outside the knowledge and comprehension of lay persons and the jury did not need assistance in determining which driver had the right-of-way. The circuit court agreed and granted the motion to exclude both experts' testimony,

---

1. Cornerstone also asserted a counterclaim against Hamer, claiming Hamer was negligent and caused property damage to Cornerstone's vehicle, but Cornerstone dismissed its counterclaim at trial.

finding Hamer had not met the burden of establishing that Grill and DiTallo "would provide any technical, scientific or specialized knowledge that would assist the trier of fact in determining which party was liable/at fault for causing the auto accident." Hamer later filed a motion to reconsider, which the court denied.

[¶7.] A jury trial was scheduled to begin on December 6, 2022. Two weeks before the trial was to commence, Hamer moved to amend his complaint. The proposed amended complaint contained an additional count consisting of 26 additional paragraphs, asserting violations of the FMCSRs, specifically, 49 C.F.R. §§ 309–399, as a basis for claims of direct negligence against Cornerstone for failing to properly train and supervise Duffy, and in retaining and entrusting Duffy with a commercial motor vehicle (CMV). Prior to a hearing on the motion to amend, the trial was continued to August 2023 due to a conflict the circuit court had with another case on its docket. At the hearing, the court denied Hamer's motion to amend the complaint, determining that it was untimely, prejudicial to Cornerstone, and futile.

[¶8.] Trial was continued an additional two times and ultimately commenced on May 20, 2024. Hamer submitted proposed jury instructions, including one instructing the jury on certain FMCSRs. That proposed instruction was rejected by the court.

[¶9.] At the conclusion of the trial, the jury concluded, on a special verdict form, that Duffy was negligent and such negligence was the legal cause of Hamer's injuries or damages, but it also found that Hamer was contributorily negligent,

more than slight, in causing the collision.  Accordingly, the jury awarded no damages to Hamer.  Hamer now appeals raising three issues:

> 1. Whether the circuit court erred in denying Hamer's motion to amend the complaint.
>
> 2. Whether the circuit court erred in excluding the expert testimony of Adam Grill and Michael DiTallo.
>
> 3. Whether the circuit court erred in refusing to instruct the jury regarding a violation of 49 C.F.R. § 392.3.

## Analysis and Decision

### *Denial of motion to amend the complaint*

[¶10.]      In the proposed amended complaint, Hamer asserts a direct liability claim against Cornerstone, alleging negligent entrustment, negligent retention, negligent supervision, and negligent training of Duffy.  These claims were largely based on Cornerstone's alleged violation of several provisions of the FMCSRs.  In addition, the proposed amended complaint alleges Duffy was "subject to and required to obey the minimum safety standards established" by the FMCSRs and that Duffy operated the truck while his ability or alertness was impaired through fatigue, so as to make it unsafe for him to operate the truck, citing the FMCSR, 49 C.F.R. § 392.3.

[¶11.]      At the hearing on Hamer's motion to amend, the circuit court orally ruled that the alleged violations of the FMCSRs do not create a "private cause of action" and the proposed amendments were, therefore, futile.  The court also denied the motion to amend based on untimeliness and prejudice, stating, "We have discovery completed, and we're ready for trial, and so I just want to necessitate [sic]

that we don't need to reopen discovery to conduct more depositions and interrogatories. We're ready to go."

[¶12.]        The rule governing amendments to a complaint provides:

> A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has neither been placed upon the trial calendar, nor an order made setting a date for trial, he may so amend it at any time within twenty days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

SDCL 15-6-15(a). "We review the circuit court's decision to grant or deny a motion to amend pleadings using the abuse of discretion standard of review." *Ries v. JM Custom Homes, LLC*, 2022 S.D. 52, ¶ 11, 980 N.W.2d 217, 221 (citation omitted). "An abuse of discretion occurs when discretion [is] exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Id.* (citation omitted).

[¶13.]        "[T]he most important consideration in determining whether a party should be allowed to amend a pleading is whether the nonmoving party will be prejudiced by the amendment." *Id.* at ¶ 12, 980 N.W.2d at 222 (citation omitted). "Prejudice is often shown when a party is surprised and unprepared to meet the contents of the proposed amendment." *Id.* (citation omitted). "The inquiry should center on whether the nonmoving party has a fair opportunity to litigate the new issue and to offer additional evidence if the case will be tried on a different point." *Prairie Lakes Health Care Sys., Inc. v. Wookey*, 1998 S.D. 99, ¶ 29, 583 N.W.2d 405, 417 (citation omitted). We have also recognized that futility is a proper basis to deny a motion to amend. *See In re Wintersteen Revocable Tr. Agreement*, 2018 S.D.

12, ¶ 33, 907 N.W.2d 785, 795 (holding the circuit court did not err in denying the motion to amend petition as futile).

a. *Prejudice*

[¶14.] At the time Hamer moved to amend his complaint in November 2022, trial was only two weeks away. A scheduling order had been in place for over 18 months, and pursuant to that scheduling order, all deadlines, including the November 2021 discovery deadline, had long passed, and the parties had completed discovery. However, prior to the hearing on the motion to amend, the trial was continued due to a conflict in the court's schedule and was set for a date eight months later. As such, Hamer contends Cornerstone would not have been prejudiced if the court had allowed the complaint to be amended because, in his view, there would have been sufficient time to conduct any additional discovery deemed necessary and prepare a defense to the new allegations.[2]

[¶15.] The vast majority of the allegations contained in the proposed amended complaint relate to a new claim that Cornerstone was directly liable for Hamer's injuries, based on Cornerstone's alleged negligent entrustment, retention, supervision, and training, as required by the FMCSRs. These allegations of direct liability significantly expanded the bases on which Hamer claimed a right to recover from Cornerstone, as Hamer's original complaint simply alleged negligence by Duffy

---

2. Hamer also noted that Cornerstone had admitted in response to an interrogatory that it had not provided any training to Duffy. He further argued that Grill's expert report (which the court had previously excluded) put Cornerstone on notice of its duties and obligations under the FMCSRs. However, Hamer did not explain why he waited until the eve of the scheduled trial date to seek permission to amend his complaint to allege these new theories of direct negligence against Cornerstone.

and respondeat superior liability of Cornerstone because Duffy was acting in the scope of his employment. The additional theories of direct liability against Cornerstone shifted the focus to Cornerstone's historical practices relating to how or whether they train employees, the extent of their background investigation of Duffy prior to hiring him, and whether they continued to independently investigate, on a yearly basis, his driving and motor vehicle records and whether he was qualified to safely operate a commercial vehicle.

[¶16.] Denial of a motion to amend is justified "if the amendment substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation." 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1487 (1990). "In a similar vein, if the court determines that the proposed amendment would result in defendant being put to added expense and the burden of a more complicated and lengthy trial or that the issues raised by the amendment are remote from the other issues in the case and might confuse or mislead the jury, leave to amend may be denied." *Id.*; *see Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998) (affirming denial of motion to amend that was filed after the discovery and motion deadline, noting the "issues raised by the proposed amendment involve different factual and legal issues than the allegations in the original complaint" and that "when late tendered amendments involve new theories of recovery and impose additional discovery requirements, courts are less likely to find an abuse of discretion due to the prejudice involved").

[¶17.] Here, the additional allegations pertaining to a claim that Cornerstone was directly liable for Hamer's injuries due to numerous federal regulations that had not been alleged in the original complaint is a completely different and remote theory of liability that would have necessitated additional discovery and the preparation of entirely new defenses. When the motion to amend was filed, the deadline for completing discovery had already passed, motions in limine had been decided, and the case was ready to be tried. The additional claim against Cornerstone would likely have necessitated reopening discovery and the setting of new deadlines for the disclosure of responsive expert witnesses to defend against the newly alleged claims and any related dispositive motions, with the possibility of further delaying the resolution of a case that had been pending for nearly three years. Accordingly, we cannot conclude that the circuit court abused its discretion when denying the motion to amend the complaint to allege these new claims asserting direct liability against Cornerstone on this basis.

[¶18.] However, the proposed amended complaint also contains allegations relating to Duffy's negligence and to his alleged violation of the FMCSRs. Hamer alleges in the proposed amended complaint that Duffy was "subject to and required to obey the minimum safety standards established by the [FMCSRs] (49 C.F.R. §§ 309–399), either directly or as adopted by the State of South Dakota pursuant to SDCL § 49-28A-3." The proposed amended complaint also alleges a specific violation of an FMCSR by Duffy:

> Defendant Duffy operated the commercial motor vehicle while his ability or alertness was so impaired, or was likely to become impaired, through fatigue, as to make it unsafe for him to operate a commercial motor vehicle. *See* 49 C.F.R. § 392.3.

These allegations do not raise or relate to a new theory of liability. Rather, they pertain to Duffy's alleged negligence that Hamer had already pled in the original complaint, including that Duffy was negligent by failing to maintain control of his truck, failing to operate the truck safely, failing to "stay vigilant, awake and alert," failing to take steps to avoid the collision, and failing to yield the right of way.

[¶19.] Therefore, at most, the new allegations that specifically relate to Duffy provide additional statutory grounds for Hamer's existing claims of Duffy's negligence. Accordingly, as to these allegations, no additional discovery was necessary and Cornerstone did not demonstrate that it would have been prejudiced by allowing Hamer to amend the complaint in this regard. The circuit court abused its discretion in denying the motion to amend on this basis.

> b. *Futility*

[¶20.] In addition to concluding that Cornerstone would have been prejudiced by the proposed amendments, the circuit court also agreed with Cornerstone's argument that the amendments were futile because the FMCSRs do not create a private cause of action. Given our determination that the circuit court abused its discretion in declining Hamer's motion to amend the complaint to allege a violation of the FMCSRs relating to Duffy's conduct, we must determine whether the court erred as a matter of law in determining that such allegation was futile.

[¶21.] Hamer argues that he has "never claimed that a violation of [the FMCSRs] creates a private cause of action separate and apart from the tort of negligence under existing state law." Instead, he argues the FMCSRs "set the minimum industry standard of care for commercial truck drivers" that should be

applied to his negligence claims. Hamer further argues that a violation of the regulations "can constitute negligence per se and evidence of common law negligence." He claims that the denial of his motion to amend was, therefore, "unjustified and clearly against, reason and evidence." Cornerstone counters that because the FMCSRs cited in the proposed amended complaint do not "create a private cause of action for personal injury auto accident claims," such regulations also cannot be used to establish the standard of care.

[¶22.] As a general premise, we have held that "[w]hether federal statutes establish a standard of care, i.e. duty, in state-based claims is a matter of state law." *Highmark Fed. Credit Union v. Hunter*, 2012 S.D. 37, ¶ 11, 814 N.W.2d 413, 416 (citing *Hofbauer v. Northwestern Nat'l Bank of Rochester*, 700 F.2d 1197, 1201 (8th Cir. 1983)). When making this determination, we note that the FMCSRs Hamer references with respect to Duffy's alleged negligence were adopted by the South Dakota Legislature and are codified at SDCL chapter 49-28A. *See* SDCL 49-28A-3 (adopting specific provisions of Title 49 of the Code of Federal Regulations, subtitle B, including "chapter III, subchapter B, part 387 and parts 390 to 397"). The federal district court of South Dakota in *Levene v. Staples Oil Co.*, 685 F. Supp. 3d 791, 808–10 (D.S.D. 2023), recently addressed whether the FMCSRs adopted by our State can be used to establish the standard of care in a common law negligence action.

[¶23.] In *Levene*, the plaintiff brought suit for damages sustained when his vehicle was struck by a tanker truck that was subject to the FMCSRs adopted in SDCL 49-28A. The plaintiff asserted claims of negligence and negligence per se

against the truck driver and the driver's employer based on alleged violations of the FMCSRs.  *Id.* at 797.

[¶24.]      On the defendant's motion for summary judgment, the district court in *Levene* noted that this Court has "consistently held that an unexcused violation of a statute enacted to promote safety constitutes negligence per se."  *Id.* at 807 (quoting *Thompson v. Summers*, 567 N.W.2d 387, 393 (S.D. 1997)).  The court in *Levene* recognized that under South Dakota law, "where a particular statutory or regulatory standard is enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred, and the plaintiff can establish this relationship to the statute, [an] unexplained violation of that standard renders the defendant negligent as a matter of law."  *Id.* at 808 (quoting *Davies v. GPHC, LLC*, 2022 S.D. 55, ¶ 43, 980 N.W.2d 251, 263).

[¶25.]      One of the issues in *Levene* was whether a negligence per se claim could be based on a violation of 49 C.F.R. § 392.14.[3]  *Id.* at 808–11.  Based in part on this Court's holdings, the district court concluded, "Because the South Dakota legislature has explicitly stated that it adopted 49 C.F.R. § 392.14 out of concern for

---

3.      49 C.F.R. § 392.14 states:

> Extreme caution in the operation of a commercial motor vehicle shall be exercised when hazardous conditions, such as those caused by snow, ice, sleet, fog, mist, rain, dust, or smoke, adversely affect visibility or traction.  Speed shall be reduced when such conditions exist.  If conditions become sufficiently dangerous, the operation of the commercial motor vehicle shall be discontinued and shall not be resumed until the commercial motor vehicle can be safely operated.  Whenever compliance with the foregoing provisions of this rule increases hazard to passengers, the commercial motor vehicle may be operated to the nearest point at which the safety of passengers is assured.

safety and because the federal regulation itself was designed to promote safety in the context of truck drivers operating a vehicle in hazardous conditions, the court rejects defendants' argument that 49 C.F.R. § 392.14 cannot provide the basis of negligence per se liability." *Id.* at 809. The court explained that the South Dakota Legislature also adopted 49 C.F.R. § 392.2, which in turn provides:

> Every commercial motor vehicle must be operated in accordance with the laws, ordinances, and regulations of the jurisdiction in which it is being operated. However, if a regulation of the Federal Motor Carrier Safety Administration imposes a higher standard of care than that law, ordinance or regulation, the Federal Motor Carrier Safety Administration regulation must be complied with.

*Id.* (citing SDCL 49-28A-3).

[¶26.] The court therefore concluded that "the South Dakota legislature's adoption of this regulation that expressly 'imposes a *higher standard of care than* [state law]' . . . alters South Dakota's common law duty by requiring 'extreme caution' in hazardous conditions rather than the general ordinary care required under ordinary negligence." *Id.* at 809–10 (citation omitted). This Court has also determined that a particular FMCSR was applicable in a case involving a claim that a truck driver pulling an oil tanker was negligent. *See Schmidt v. Royer*, 1998 S.D. 5, ¶¶ 21–22, 574 N.W.2d 618, 624 (holding that the trial court incorrectly ruled that a state statute and 49 C.F.R. § 393.52, which relate to minimum braking requirements, did not apply to a negligence claim in a wrongful death action against

a semi-truck driver and that plaintiff "should have been allowed to impeach [the defendant's accident reconstruction expert] with the statutes and regulations").[4]

[¶27.]    Cornerstone has not addressed the *Levene* court's application of existing South Dakota law pertaining to statutes enacted to promote public safety, and neither of the parties noted this Court's prior application of an FMCSR in *Schmidt*. Instead, Cornerstone maintains that this Court's opinion in *Highmark Fed. Credit Union v. Hunter*, precluded Hamer's proposed additional claim against Cornerstone, which alleges several violations of the FMCSRs. In *Highmark*, the defendant in a foreclosure action (Hunter) counterclaimed, alleging Highmark was negligent in failing to purchase flood insurance, as required under the National Flood Insurance Act (NFIA).[5] Hunter claimed that such failure was a breach of Highmark's statutory duty and constituted negligence as a matter of law. 2012 S.D. 37, ¶ 4, 814 N.W.2d at 415. Although Hunter argued that her claim was based on common-law negligence, we noted that "any duty [Highmark] owed to [Hunter] would have arisen from the [NFIA], a breach of which would violate the [NFIA]. For this reason, [Hunter's] claims are based directly on alleged violations of the [NFIA]." *Id.* ¶ 12, 814 N.W.2d at 416 (alterations in original) (citation omitted).

---

4.    Although ARSD 61:23:01:01, the administrative rule adopting the federal regulation at issue that we noted in *Schmidt*, was later repealed, SDCL 49-28A-3 adopts the same FMCSRs (49 C.F.R. §§ 390 to 397) as noted in this now-repealed administrative rule.

5.    The NFIA requires "flood insurance for loans secured by improved real estate located within a designated special flood hazard area" and requires that lending institutions "notify a borrower of the flood insurance requirement." *Highmark*, 2012 S.D. 37, ¶ 8, 814 N.W.2d at 415 (citing 42 U.S.C. § 4012a(b)). "[I]f the borrower fails to obtain flood insurance, the lender must do so at the borrower's expense. *Id.* (citing 42 U.S.C. § 4012a(e)).

[¶28.]     In considering whether the NFIA established a duty, we found that

other states had rejected such a notion, stating:

> Based on congressional findings, courts have consistently held
> that in adopting the NFIA, Congress meant to protect lenders
> and the federal treasury.  "Although Congress intended to help
> borrowers damaged by flooding, 'the principal purpose in
> enacting the [National Flood Insurance Program] was to reduce,
> by implementation of adequate land use controls and flood
> insurance, the massive burden on the federal fisc of the ever
> increasing federal flood disaster assistance.'"

*Id.* ¶ 15, 814 N.W.2d at 417 (internal citations omitted).  We also concluded the

"next reason that the NFIA does not establish a duty in a negligence case is that the

NFIA does not create a private right of action.  A private right of action essentially

indicates the right of an individual to bring an action to enforce particular

regulations or statutes."  *Id.* ¶ 16 (citation omitted).  We explained that if the NFIA

does not create a private right of action, then it follows that an individual cannot

use the NFIA to establish a duty in an individual civil claim.  *Id.* at 417–18.[6]

---

6.     Cornerstone notes that in *Highmark*, we cited a North Dakota opinion
       addressing an alleged violation of the NFIA which states that "[t]he
       separation-of-powers doctrine and principles of federalism militate against
       the adoption of the federal statute as the standard of care in a state
       negligence action when no private cause of action, either explicit or implicit,
       exists in the federal statute."  *Highmark*, 2012 S.D. 37, ¶ 17, 814 N.W.2d at
       418 (quoting *R.B.J. Apartments, Inc. v. Gate City Sav. & Loan Ass'n*, 315
       N.W.2d 284, 290 (N.D. 1982)).  However, as explained by the Eighth Circuit
       in *Hofbauer*, another case we cited in *Highmark*, whether federal regulations
       set the standard of care for a state common law action is a question that must
       be resolved by each state:

       > Even though the Hofbauers cannot assert a private cause of
       > action arising under federal law, the federal statutes may create
       > a standard of conduct which, if broken, would give rise to an
       > action for common-law negligence. . . . The NFIA does not itself
       > create a federal cause of action, but we do not think it prohibits

                                                      (continued . . .)

[¶29.] The NFIA at issue in *Highmark* is decidedly different from the FMCSRs at issue here. The NFIA was not enacted for the benefit of the borrowers, nor was safety the motivation; rather, it was enacted for the benefit of the lenders, and the motivation was financial. *Id.* In contrast, the FMCSRs were enacted "to promote the safe operation of commercial motor vehicles" and "to ensure increased compliance with traffic laws and with the commercial motor vehicle safety and health regulations and standards prescribed and orders issued under this chapter." 49 U.S.C. § 31131(a)(1) and (3). Significantly, the South Dakota Legislature has adopted portions of the FMCSRs, including 49 C.F.R. § 392.3, which Hamer cites in his proposed amended complaint, with some modifications not relevant here. *See* SDCL 49-28A-3.[7]

---

(. . . continued)

> a state court from finding negligence when there has been a violation of the statute.

*Hofbauer*, 700 F.2d at 1201. For the reasons explained above, we conclude that our Legislature's adoption of the FMCSRs as the standard of care for CMV drivers presents a much different scenario than the question pertaining to the NFIA regulations at issue in *Highmark*.

7. Violations of certain portions of the statute also constitute a crime in South Dakota:

> Any violation of part 387 and parts 390 to 396, inclusive, the motor carrier safety requirements governing the qualifications of drivers, driving of motor vehicles, parts and accessories necessary for safe operation, notification and reporting of accidents, assistance with investigations and special studies, hours of service of drivers, inspection, repair, and maintenance is a Class 2 misdemeanor.

SDCL 49-28A-3.

[¶30.] Further, "[t]his Court has consistently held that 'an unexcused violation of a statute enacted to promote safety constitutes negligence per se.'" *Thompson*, 1997 S.D. 103, ¶ 16, 567 N.W.2d at 393 (applying negligence per se in case alleging violation of federal and state statutes) (citation omitted); *Fritz v. Howard Twp.*, 1997 S.D. 122, ¶ 16, 570 N.W.2d 240, 243 (noting violation of a safety statute is negligence per se in cases where the state adopted the national standards for all traffic control devices and state law required that signs "conform to uniform national signing standards"); *see also NFI Interactive Logistics LLC v. Bruski*, 239 N.E.3d 63, 75 (Ind. Ct. App.) (noting, in a case alleging violations of state statutes that incorporate certain FMCSRs, that the violation of "federal statutes and regulations is commonly given negligence per se effect in state tort proceedings"); *Fortner v. Tecchio Trucking, Inc.*, 597 F. Supp. 2d 755, 757–58 (E.D. Tenn. 2009) (applying Tennessee law and concluding that violations of the FMCSRs can constitute negligence per se); *Ballinger v. Gustafson*, No. 22CV213, 2022 WL 16758558, at *3 (D. Neb. Oct. 19, 2022) (noting that under Nebraska law, "[v]iolations of the FMCSR can be considered together with other evidence of negligence at trial for personal injury claims arising out of a motor vehicle accident" (citation omitted)).[8]

---

8. The cases Cornerstone cites in support of its contention that the FMCSRs cannot form the basis for Hamer's negligence claims are distinguishable. *See Drake v. Old Dominion Freight Line, Inc.*, No. 15-1307, 2016 WL 1328941, at *3–4 (D. Kan. 2016) (concluding the plaintiff could not bring *a private cause of action* for a violation of the FMCSR, but not addressing whether violations of the regulations could support a negligence per se theory under a state statute); *Leon v. FedEx Ground Pkg. Sys., Inc.*, No. 13-1005, 2016 WL 836980, at *14–15 (D.N.M. Feb. 16, 2016) (noting that New Mexico had not

(continued . . .)

[¶31.]     For these reasons, we conclude that the FMCSRs adopted in SDCL 49-28A-3 that Hamer cites when asserting that Duffy negligently operated a CMV may provide a standard of care relating to common law negligence claims against commercial vehicle operators, and that an unexcused violation of such regulations may constitute negligence per se, just like any other traffic safety statute. *See, e.g.*, *Nicolay v. Stukel*, 2017 S.D. 45, ¶ 20, 900 N.W.2d 71, 79 ("Ordinarily, the violation of a statute or ordinance, unless under certain circumstances which are excusable or justifiable, constitutes negligence [p]er se if such violation is the proximate cause of the injury to the person for whose protection the statute was enacted." (alteration in original) (citation omitted)). Hamer's proposed amendments that assert Duffy's alleged violations of the FMCSRs are, therefore, not futile, and the circuit court erred in concluding otherwise. The court's denial of the motion to amend on this basis was an abuse of discretion. *Olson v. Huron Reg'l Med. Ctr., Inc.*, 2025 S.D. 34, ¶ 18, 24 N.W.3d 405, 412 ("[A]n error of law is never within the range of permissible choices and necessarily constitutes an abuse of discretion." (citation omitted)).

### *Exclusion of expert testimony*

[¶32.]     Hamer next argues the circuit court erred in excluding his expert witnesses, Adam Grill, an expert specializing in the safe operation of CMVs and the standard of care for commercial vehicle operators, and Michael DiTallo, an accident

---

(. . . continued)
    adopted the relevant provisions of the FMCSRs when determining that the plaintiff did not have a common law cause of action for violations of the FMCSRs).

reconstructionist.[9]  In seeking to exclude the testimony of Grill and DiTallo, Cornerstone did not challenge their qualifications or the bases of their opinions, but claimed that expert testimony was not necessary or required to assist the jury in understanding the evidence or determining a fact at issue in this case.

[¶33.]       The circuit court agreed and concluded that Hamer had not met the burden of proving that either expert would provide any technical, scientific, or specialized knowledge that would assist the jury in determining which party was at fault for causing the accident.  At a later hearing on Hamer's motion to reconsider its ruling on the exclusion of Hamer's expert witnesses, the court reaffirmed its position that the experts' testimony was inadmissible, stating, "there still isn't a *need* to have the expert witness."

[¶34.]       "The circuit court has discretion in admitting or excluding expert testimony, and therefore, we review a court's evidentiary ruling on expert testimony for an abuse of discretion."  *Thompson v. Avera Queen of Peace Hosp.*, 2013 S.D. 8, ¶ 7 n.1, 827 N.W.2d 570, 573 n.1 (citation omitted).  The admission of expert testimony is governed by SDCL 19-19-702 (Rule 702), which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

9.    Grill's expert report also contains information and opinions regarding Cornerstone's obligations under the industry standards and regulations with respect to the hiring, training, and supervision of Duffy.  In light of our determination that the circuit court did not abuse its discretion in denying Hamer's untimely motion to amend his complaint to allege these direct negligence claims against Cornerstone, we confine our analysis of the court's exclusion of Grill's testimony to his opinions relating to the negligence claims asserted against Duffy.

>  (a) *The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;*
>
>  (b) The testimony is based on sufficient facts or data;
>
>  (c) The testimony is the product of reliable principles and methods; and
>
>  (d) The expert has reliably applied the principles and methods to the facts of the case.

SDCL 19-19-702 (emphasis added).

[¶35.] The requirement that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue" is a requirement that "goes primarily to relevance." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993). Thus, "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (citation omitted). We have said that "[t]o be helpful, of course, expert opinion must offer more than something jurors can infer for themselves." *Black v. Div. of Crim. Investigation*, 2016 S.D. 82, ¶ 23, 887 N.W.2d 731, 737.

> a. *Whether Grill's testimony was admissible*

[¶36.] As to Grill's testimony, Hamer argues that Grill's opinions were relevant to whether Duffy failed to possess and exercise the "degree of training, knowledge and skills required to operate a [c]ommercial [v]ehicle, given its size, weight and handling characteristics, particularly before changing speed and direction." In response, Cornerstone maintains that Grill conceded that the standard of care for truck drivers is the same for every road user and that his opinions regarding Duffy's failure to adhere to certain industry standards relate to

standards that apply to every motor vehicle operator. Cornerstone thus argues that whether Duffy violated those standards did not *require* expert testimony.

[¶37.]   Cornerstone's argument misses the mark, however, because it confuses the issue of whether expert testimony is *required* in certain types of cases, as opposed to whether it would *assist* the jury when considering the evidence and determining the relevant facts at issue. Moreover, the facts at issue are not confined solely to the question of which driver had the right of way, as Cornerstone suggested to the circuit court. Given the circumstances of this case, a determination of the *comparative* negligence of each driver was equally, if not more, significant to the dispositive questions presented to the jury. When viewing the facts at issue in this broader scope, it is apparent that Grill's testimony would have assisted the jury when making these determinations.

[¶38.]   While Grill acknowledged that the standard of care is the same for truck drivers as for other non-commercial drivers, his opinions focus on the further point that the "performance standards to accomplish this standard of care are much different for truck drivers than operators of smaller vehicles." Grill's expert report explains why CMVs "are more complicated and less stable than non-CMVs, making them more difficult to operate." He notes that, "[i]n comparison to non-commercial vehicles, their design characteristics, control instruments, and mechanical systems require special knowledge, skills, and driving behaviors in order to drive them safely, legally, and efficiently." Grill provided a partial list of differences between regular vehicles and CMVs, including that CMVs are bigger and heavier than other vehicles, are more difficult to maneuver, are more complex to drive, take longer to

accelerate and stop, have complex vehicle systems and more individual components, require special knowledge and skills to operate and maintain, require a special driver's license, certification, and qualification, have more and different regulations to obey, require more alertness, caution, and greater driver performance duties in order to achieve the same standard of care as other road users, have different energy absorbing systems that are often mismatched with smaller vehicles, and have significant mass/weight differences.

[¶39.]     As such, Grill pointed out that CMV drivers are required to know and obey a much broader and more stringent series of state and federal regulations than other drivers.  These include the CDL standards as well as the FMCSRs.  Grill's report explains several requirements in the CDL manual concerning "managing speed and space, keeping a proper lookout, and accident avoidance and mitigation."  In particular, he notes:

> All applicants for a CDL must possess and demonstrate the following safe on-road driving skills for their vehicle class: (1) Ability to use proper visual search methods; . . . (3) Ability to adjust speed to the configuration and condition of the roadway, weather and visibility conditions, traffic conditions, and motor vehicle, cargo and driver conditions; . . . (8) Ability to observe the road and the behavior of other motor vehicles, particularly before changing speed and direction.

Grill opined:

> These required skills were required of Defendant Duffy at the time of his crash.  Additionally, just like the knowledge requirements, these skills objectives are promulgated in greater detail in the CDL Manual and other industry sources cited in this report; and necessary for the safe operation of a CMV.  Had Defendant Duffy been given a CDL skills test at the time of this collision, he would have failed to meet the standards necessary to receive his CDL, and therefore it is evident to me that at the time of this collision he failed to even meet the basic minimum

expectations of a CMV operator as it relates to the circumstances of this collision.

[¶40.] Grill more specifically opined that Duffy "caused his own preventable collision" and explained the responsibilities of professional drivers when approaching, entering and crossing intersections, and how turning movements require "exacting care" to prevent "squeeze plays at both left and right turns." He also notes several common causes of collisions, one of which Hamer asserts here—driving while fatigued.

[¶41.] Hamer argues Grill's testimony that drivers need at least eight hours of off-duty rest to operate a commercial vehicle in compliance with federal regulations, namely 49 C.F.R. § 392.3, was admissible and relevant to the facts of this case. At trial, Duffy testified that he works 13 hours per day and gets six and a half hours of sleep—he goes to sleep at 8:30 p.m., gets up at 11:30 p.m. to deliver papers until 2:30 a.m., and then sleeps again until 6 a.m. These facts sufficiently presented a question whether Duffy was fatigued when driving his truck on the morning in question.

[¶42.] When considering whether to exclude Grill's testimony, the circuit court erred when focusing on whether this expert testimony was *required* as opposed to whether it would be *helpful* to the jury. Properly focusing on that determination, we conclude that Grill's opinions were admissible, as they provide technical and other specialized knowledge regarding CMVs, and the skills and requirements expected of those who are licensed to drive them, that many laypersons, who have never driven such vehicles or possessed a CDL, would not have. *See* SDCL 19-19-702.

[¶43.]     Further, even if some of Grill's opinions related to more general principles of driving, such testimony is nevertheless "helpful." *State v. Johnson*, 2015 S.D. 7, ¶ 33, 860 N.W.2d 235, 248 (citation omitted) ("[A]n expert's testimony may be admissible even if the expert's sole function is 'to educate the factfinder about general principles . . . .' For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by the expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case.") (citation omitted).  Grill's proposed testimony meets all of these requirements. *See Abrams v. FedEx Ground Package Sys., Inc.*, 585 F. Supp. 3d 1131, 1152 (S.D. Ill. 2022) (holding that the "[p]laintiff may present the relevant FMCSRs through [their expert] as this will assist the jury in understanding the standard of care in the trucking industry, an area with which they may not be familiar").

[¶44.]     For these reasons, we conclude that the circuit court's determination that Grill's proposed testimony was not helpful is not justified by, and clearly against, reason and evidence.  The court therefore abused its discretion in excluding Grill's testimony.

   b.     *Whether DiTallo's testimony was admissible*

[¶45.]     Regarding the exclusion of DiTallo's testimony, Hamer argues that such testimony is relevant to how the accident occurred, the speed of the drivers, and their relative response time.  Specifically, Hamer claims DiTallo's testimony is relevant to a determination of whether Duffy had sufficient time to recognize and

respond to the presence of Hamer's pickup and whether he failed to abide by traffic safety rules.

[¶46.] DiTallo, an expert in traffic accident investigation and reconstruction, offered the following opinions on the cause of the accident based on his analysis of the information he was provided regarding the intersection, the accident report, statements by Duffy and Hamer, and his personal calculations:

> 1. Based on my analysis, Mr. Paul Duffy was situationally inattentive to the approaching Chevrolet.
>
> 2. Based on my analysis, using an average Perception/Response time, Mr. Paul Duffy had between 4.4 [to] 4.9 seconds to respond to the approaching Chevrolet and avoid this collision.
>
> 3. Based on my analysis, Mr. Duffy failed to yield to an approaching vehicle while in an intersection making a left turn.
>
> 4. Based on my analysis, Mr. Duffy violated South Dakota statute 32-26-19, Left-turning Vehicles - Right-of-way of Oncoming Vehicle.

[¶47.] DiTallo's opinions were related to several issues before the jury— whether Hamer or Duffy had the right of way, whether Duffy had adequate time to stop and avoid the collision notwithstanding who had the right of way, and whether Duffy violated a state statute. Such testimony is commonly admitted in cases involving alleged negligence in motor vehicle accidents. *See South v. Nat'l R. R. Passenger Corp. (AMTRAK)*, 290 N.W.2d 819, 831–32 (N.D. 1980) (affirming admission of expert testimony on "reaction times and effects of the coefficient of friction on stopping time and distance" concluding such testimony would "assist the jury in its determination of the issues"); *Blalock v. Claiborne*, 775 S.W.2d 363, 366

(Tenn. Ct. App. 1989) (affirming admission of expert testimony "concerning the reaction time for stopping a vehicle, based upon the speed of defendant's automobile at the time of impact and other factors"); *Hughes v. Vestal*, 142 S.E.2d 361, 364 (N.C. 1965) ("Some courts have declared that reaction time or the distance required to stop a given vehicle at a given speed under given conditions of road surface is a proper matter for expert opinion." (citations omitted)).

[¶48.]     DiTallo's proposed testimony that Duffy was inattentive and could have avoided the collision was based on his specialized skill in determining such things as the reaction time based on the particular speed and distance at issue here. These opinions are relevant and helpful to the jury when applying the jury instructions referenced above. Importantly, there was no accident reconstruction performed on the scene that would otherwise have assisted the jury in assessing the comparative distance and reaction times each driver had when navigating this intersection.

[¶49.]     Further, after successfully opposing the admission of DiTallo's expert opinions on this issue, counsel for Cornerstone argued to the jury in closing that, when trying to determine whether Duffy caused the accident, they should think about the distance each vehicle had to travel and which one likely accelerated faster. Counsel referred to this as "circumstantial evidence" and told the jury, "I'm not here to tell you that I'm solving this case." Notably, these are precisely the types of determinations for which an opinion by one with expertise in accident reconstructions would have been helpful. We, therefore, conclude that DiTallo had "technical, or other specialized knowledge" that would have assisted the jury in

understanding the evidence and/or determining a fact in issue and, therefore, the circuit court abused its discretion in excluding his testimony.

          *c.*      *Whether the exclusion of the experts' testimony was prejudicial*

[¶50.]      To be reversible, the exclusion of evidence must also be prejudicial. *Weiland v. Bumann*, 2025 S.D. 9, ¶ 58, 18 N.W.3d 148, 162 ("Importantly, evidentiary rulings are only reversible when error is demonstrated *and* shown to be prejudicial error." (citation modified)).  An error is prejudicial if there is a "reasonable probability that, but for [the error], the result of the proceeding would have been different."  *Id.* (alteration in original) (citation omitted).

[¶51.]      Here, the two experts' opinions were complementary, and their testimony would have assisted the jury in applying the facts of this case to the law on which they were instructed.  Some of the instructions on general negligence principles and traffic laws incorporated the concepts underlying Grill's opinions.  In particular, the jury was instructed that there is a duty to "exercise ordinary care at all times to avoid placing the driver or others in danger and to exercise ordinary care to avoid an accident.  While a driver may assume that others will exercise due care and obey the law, a driver may not for that reason omit any care which the law demands."  The jury was also instructed that "after having stopped, the driver shall yield the right-of-way to any vehicle which has entered or is approaching the intersection from another highway and may not proceed into the intersection until certain that such intersecting roadway is free from oncoming traffic which may affect safe passage" and that "the driver of a vehicle within an intersection intending to turn to the left shall yield the right-of-way to any vehicle approaching

from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard."

[¶52.] Relevant to such instructions, Grill offered opinions regarding the heightened skills and awareness required of a CDL holder operating a CMV when navigating such scenarios. Although counsel for Hamer questioned Duffy about several of the applicable requirements in the CDL manual, which was admitted as an exhibit at trial, Hamer was prevented from offering any expert testimony on how the CDL requirements relate to Duffy's alleged violation of those requirements, or on how these alleged violations contributed to the accident.

[¶53.] DiTallo's proposed testimony was similarly important to Hamer's case. Although the jury concluded that both Hamer and Duffy were negligent, the jury was asked to assess the *comparative* negligence and relative degrees of fault by each driver. If, as DiTallo opined, Duffy had 4.4 to 4.9 seconds to react and respond to Hamer's approaching vehicle, DiTallo's opinions, particularly when paired with testimony from Grill regarding the defensive driving standards required of CMV drivers, could conceivably have tipped the scales in Hamer's favor as to whether Hamer's negligence was comparatively slight or less than slight.

[¶54.] On the whole, there is a reasonable probability that the jury would have reached a different outcome if the experts' testimony had not been excluded. The circuit court's exclusion of Grill's and DiTallo's opinions was, therefore, prejudicial error, warranting a reversal.

### *Refusal of jury instruction regarding 49 C.F.R. § 392.3*

[¶55.]     Hamer argues on appeal that the circuit court erred in refusing to instruct the jury on 49 C.F.R. § 392.3, which states:

> No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle.

The proposed jury instruction quoted this language and advised the jury that a violation of such regulation constituted negligence.

[¶56.]     "A circuit court's denial of proposed jury instructions is also reviewed under an abuse of discretion standard." *Weiland*, 2025 S.D. 9, ¶ 73, 18 N.W.3d at 164.  In *Overfield v. Am. Und'rs Life Ins. Co.*, we reiterated that the circuit court "must present only those instructions to the jury which are supported by competent evidence and set forth the applicable law."  2000 S.D. 98, ¶ 11, 614 N.W.2d 814, 816 (citation omitted).

[¶57.]     Hamer's initial complaint alleged, in count one, that one of the bases for finding Duffy negligent was that he failed to "stay vigilant, awake, and alert." The above-referenced federal regulation included in the proposed jury instruction, adopted in SDCL 49-28A-3, relates to such claim.  In light of our determination that this safety regulation adopted by our Legislature may be considered as the standard of care when determining whether a driver licensed to operate a CMV has been negligent, Hamer's proposed instruction relating to Duffy's driving is an accurate instruction on the applicable law.  The circuit court therefore abused its discretion

in refusing to instruct the jury on the provisions of 49 C.F.R. § 392.3, as it relates to Duffy's alleged negligence.

## Conclusion

[¶58.] We affirm the circuit court's denial of Hamer's motion to amend his complaint to allege direct negligence claims against Cornerstone, but we reverse the court's denial of the motion to amend the complaint with respect to the allegations relating to Duffy's negligent conduct. We also reverse the court's exclusion of the expert testimony of Adam Grill and Michael DiTallo, and the court's refusal to instruct the jury on the standard of care set forth in 49 C.F.R. § 392.3. We remand for further proceedings consistent with this opinion.

[¶59.] Affirmed in part and reversed in part.

[¶60.] JENSEN, Chief Justice, and SALTER and MYREN, Justices, and KERN, Retired Justice, concur.

[¶61.] GUSINSKY, Justice, not having been a member of the Court at the time this action was considered by the Court, did not participate.